United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 18, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-20550

_____

KARAHA BODAS COMPANY, L.L.C.,

Plaintiff-Appellee,

versus

PERUSAHAAN PERTAMBANGAN MINYAK
DAN GAS BUMI NEGARA; ET AL,

Defendants,

PERUSAHAAN PERTAMBANGAN MINYAK
DAN GAS BUMI NEGARA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before WIENER and STEWART, Circuit Judges, and RESTANI, Judge.[*]

WIENER, Circuit Judge:

Defendant-Appellant Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina") appeals the district court's preliminary injunction prohibiting it from prosecuting an action it instituted in Indonesia (1) to annul a Swiss arbitration award (the "Award") to Appellee, Karaha Bodas Company, L.L.C. ("KBC") and (2) to enjoin KBC from taking steps to enforce the Award.[1]  In addition,

_____

[*] Judge of the U.S. Court of International Trade, sitting by designation.

[1] In a separate challenge, Pertamina has appealed the district court's judgment enforcing the arbitral award.

Pertamina challenges the district court's order holding it in contempt for continuing to pursue the Indonesian action in violation of the court's initial temporary restraining order ("TRO").[2] Given the structure and purpose of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or the "Convention"),[3] and the responsibilities of the United States under that treaty, we

Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 190 F. Supp. 2d 936 (S.D. Tex. 2001). KBC moved to consolidate oral argument on enforcement of the Award with the appeal here on the preliminary injunction but that motion was denied. Order dated September 5th, 2002. In March, 2003, the panel addressing enforcement remanded the case for consideration of Pertamina's Rule 60(b) motion, and in April, 2003, the district court denied in part Pertamina's motion. In addition to the enforcement judgment itself, there are subsequent similar injunctions issued by the district court that are not before us. See, e.g., July 22, 2002 Order (requiring Pertamina to unequivocally and strenuously request that the Indonesian court postpone proceedings); July 3, 2002 Order (enjoining Pertamina from taking substantive steps in furtherance of annulment). KBC also has filed a second motion for contempt on grounds that Pertamina has not complied with any of the court's orders, including the preliminary injunction on appeal here. KBC's Amended Second Motion for Contempt, June 11, 2002.

[2] When the court issued its preliminary injunction order, it expressly stated that both its TRO and its contempt order were superceded by this injunction, but folded many of the substantive provisions of those orders into the injunction. Nevertheless, both Pertamina and KBC separately address the validity of the contempt order. For a more complete explanation of the status of the contempt order on appeal, see infra Part II.D.

[3] United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards [hereinafter "New York Convention"], June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (entered into force with respect to the United States, Dec. 29, 1970), codified at 9 U.S.C. § 201 et seq.

conclude that the district court abused its discretion[4] in granting the preliminary injunction in favor of KBC, requiring that we vacate that injunction and, to the extent necessary, the district court's order holding Pertamina in contempt.

## I. FACTS AND PROCEEDINGS

The origins of this dispute lie in two contracts to construct a power plant in Indonesia. Pertamina is an oil, gas, and geothermal energy company that is wholly owned by the Government of Indonesia ("GOI"). KBC is a Cayman Islands limited liability private power development company established to develop geothermal resources, including the construction and operation of electric power generating facilities.[5] In November 1994, KBC entered into two contracts with Pertamina to develop the Karaha-Bodas Geothermal Project (the "Project"), which included the building of a geothermal power plant in West Java, Indonesia. Under the first agreement, the Joint Operation Contract ("JOC"), KBC contracted with Pertamina to develop geothermal energy resources from two geothermal fields in Indonesia. In the second agreement, the Energy Sales Contract ("ESC"), KBC, Pertamina, and Pt. PLN

---

[4] See United States v. Logan, 861 F.2d 859, 866 n.5 (5th Cir. 1988) ("abuse of discretion is a phrase which sounds worse than it really is; it is simply a legal term of art which carries no pejorative connotations of a professional or personal nature") (citation and internal quotation marks omitted).

[5] The principal investors in KBC are two energy companies: Caithness Energy, L.L.C. ("Caithness") and FPL Energy, L.L.C. ("FPL").

3

(Persero) ("PLN"), an electric company wholly owned by the GOI,[6] agreed that Pertamina would sell the KBC-produced electricity to PLN.

In 1997, the Indonesian economy suffered during the Asian financial crisis. In January 1998, after a brief suspension and a temporary restoration of the Project, the President of Indonesia issued a decree suspending the Project indefinitely as part of a national effort to stabilize the Indonesian economy. KBC declared force majeure and ceased performance under the contracts.

The contracts contained almost identical comprehensive consultation and arbitration clauses which required the parties to arbitrate any disputes in Switzerland pursuant to the Arbitral Rules of the United Nations Commission on International Trade Law (the "UNCITRAL Rules"). In April 1998, KBC initiated arbitration proceedings in Switzerland, claiming that Pertamina had breached the contracts. Pertamina opposed arbitration on various grounds, which included a challenge to the composition of the arbitration panel. The panel rejected those objections and proceeded to conduct a hearing on the merits in June 2000. In December 2000,

---

[6] PLN, a party to the ESC agreement, was a respondent at the arbitration, and was originally named a respondent in the action before the district court, but was not served and has been voluntarily dismissed from the case by KBC.

the panel ruled that Pertamina and PLN had breached the contracts and awarded damages to KBC exceeding $260 million.[7]

In February 2001, Pertamina appealed the Award to the Supreme Court of Switzerland. While that appeal was pending, KBC initiated the instant proceedings in federal district court to enforce the Award. Pertamina responded by challenging enforcement on four grounds under Article V of the New York Convention: (1) The arbitration panel was improperly composed (Article V(1)(d)); (2) the arbitration procedures were not otherwise in accordance with the agreement (Article (V)(1)(d)); (3) Pertamina was deprived of its right to present its case (Article V(1)(b)); and (4) the arbitral award violated United States public policy (Article V(2)(b)).[8] The district court denied Pertamina's motion to stay pending its appeal to the Supreme Court of Switzerland and directed the parties to proceed with summary judgment briefing. The court acknowledged, however, that it slowed the proceedings in deference Pertamina's request. The Swiss court eventually dismissed Pertamina's appeal on procedural grounds and denied its motion for reconsideration.[9] In December 2001, the district court granted

---

[7] The arbitration panel awarded KBC (1) $111.1 million in damages for lost expenditures; (2) $150 million in damages for loss of profits; (3) $66,655 for costs and expenses of the final phase of arbitration; and (4) 4% post-judgment interest.

[8] See New York Convention, art. V.

[9] In April 2001, the Swiss Supreme Court dismissed Pertamina's claim because of untimely payment of costs.

5

KBC's motion for summary judgment (the "Judgment") to enforce the Award.

Pertamina appealed the Judgment but declined to post a supersedeas bond. In January 2002, the district court entered an order allowing KBC to commence execution of the Judgment, and the following month that court granted KBC leave to register the Judgment in New York, Delaware, and California. KBC also brought actions under the Convention in Hong Kong, Canada, and Singapore to enforce the Award in those jurisdictions.

In March 2002, Pertamina filed an application in the Central District Court of Jakarta to annul the Award (the "Indonesian annulment action"). Pertamina also sought an Indonesian injunction and penalties to prevent KBC from seeking to enforce the Award (the "Indonesian injunction"). The Indonesian court scheduled a proceeding for 10:00 a.m. on Monday April 1, 2002 to hear argument on the proposed injunction. In advance of the Indonesian hearing, however, KBC filed a motion in the district court on Friday, March 29, 2002, for a temporary restraining order to enjoin Pertamina from seeking injunctive relief in Indonesia. In a telephonic hearing that same evening,[10] the court determined that KBC would

_____

Pertamina moved for reconsideration, arguing that the late payment was the result of circumstances beyond Pertamina's control. In August 2001, the Swiss Federal Tribunal denied Pertamina's request for reconsideration.

[10] March 29, 2002, was a legal holiday in Indonesia (Good Friday). Jakarta is 13 hours ahead of Houston (Central Standard Time). Counsel for Pertamina participated by

suffer irreparable harm if the Indonesian court issued an injunction to prevent KBC from "enforcing or executing" the Judgment. The district court orally ordered Pertamina to withdraw its application for injunctive relief at or before the hearing in the Indonesian court and to take no substantive steps in that court. The district court did not, however, prohibit Pertamina from proceeding in Indonesia entirely; rather, it prohibited Pertamina from taking any substantive steps (e.g., submitting legal arguments) but permitted Pertamina to take any ministerial steps necessary to maintain the cause of action. The court subsequently explained that it issued the TRO (1) to preserve the integrity of its judgment, which had become final and was on appeal to us without bond, and (2) to maintain the parties' positions as they stood prior to Pertamina's initiation of the Indonesian annulment action.

Claiming that it lacked sufficient time to do so, Pertamina did not withdraw its request for injunctive relief, and the Indonesian court issued a provisional injunction prohibiting KBC from seeking to enforce the Award. Later that day, Pertamina's president-director issued a statement to the effect that Pertamina would not attempt to enforce the Indonesian court's order with respect to KBC's enforcement actions in the United States.

---

phone.

7

KBC immediately filed a motion in the district court to hold Pertamina in contempt of the TRO. Agreeing with KBC, the district court (1) again ordered Pertamina to withdraw its Indonesian application for injunctive relief against KBC, (2) found Pertamina in contempt of the TRO, and (3) ordered Pertamina to indemnify KBC for any fines resulting from the Indonesian injunction.[11] Pertamina notified the Indonesian court of the district court's order but did not request that the Indonesian court vacate or suspend its injunction as directed by the district court.

KBC next filed a motion in the district court for a preliminary injunction to prohibit Pertamina from further pursuing the Indonesian injunction and the Indonesian annulment action. In response, Pertamina filed a motion to purge the contempt order on the ground that the statement by Pertamina's president was sufficient to establish substantial compliance with the TRO. In subsequently granting KBC's motion, the district court issued seven orders: (1) It enjoined Pertamina from enforcing the Indonesian injunction; (2) it enjoined Pertamina from collecting any fine or penalty from KBC as a result of this injunction; (3) it extended

---

[11] The district court actually issued two indemnification-like orders. It ordered Pertamina to indemnify KBC for any monetary penalties imposed by the Indonesian court, and it ordered Pertamina to pay KBC for monetary penalties imposed by any other court on the basis of the Indonesian injunction, before such payment is due.

the indemnification aspects of its earlier contempt order;[12] (4) it enjoined Pertamina from taking any substantive steps to prosecute the Indonesian annulment action; (5) it ordered Pertamina to advise the Indonesian court that Pertamina cannot and will not take any action to pursue the Indonesian annulment action; (6) it dissolved the provisions of the TRO and contempt order to the extent those orders differed with the preliminary injunction; and (7) it denied Pertamina's motion to purge contempt.

On May 7, 2002, Pertamina informed the Indonesian court of the district court's preliminary injunction and, pursuant to that injunction, requested the Indonesian court to suspend the proceedings indefinitely. A week later, the Indonesia court rejected Pertamina's request to suspend the litigation, in part because PLN, which was also a party to the Indonesian litigation, filed an objection to postponement, and in part because the court concluded that it retained the authority to adjudicate the case.

Pertamina timely filed its notice of appeal to this court. In May 2002, we denied Pertamina's emergency motion for a partial stay of the district court's preliminary injunction. On August 27, 2002, while the matter was still under our review, the Central Jakarta District Court concluded that it had primary jurisdiction

---

[12] The indemnification provisions of the contempt order were restated in the preliminary injunction. Although we may discuss the indemnification on its own terms, by vacating the preliminary injunction order today, we also vacate the indemnification provisions of this order.

under the New York Convention and annulled the Award on grounds that it was contrary to the Convention and Indonesian arbitration law. The Indonesian court also permanently enjoined KBC from seeking to enforce the Award and imposed a fine of $500,000 for each day that KBC violated the Indonesian injunction.

In March 2003, the High Court of the Hong Kong Special Administrative Region Court of First Instance issued an order enforcing the Award in Hong Kong. Subsequently, the district court addressed Pertamina's Rule 60(b) motion to set aside judgement pursuant to our remand. The court reaffirmed its summary judgment in favor of KBC, concluding again that under the Convention the courts of Indonesia are not competent to annul the Award.

In this appeal, Pertamina argues that the district court lacked authority to issue the preliminary injunction and, in the alternative, that the court abused its discretion by doing so. Pertamina also appeals the district court's contempt order, again arguing that the district court lacked authority to enjoin Pertamina from proceeding in Indonesia and, in the alternative, that Pertamina substantially complied with the order.[13]

II. ANALYSIS

A.   STANDARD OF REVIEW

---

[13] Pertamina advances the argument as well that the district court, in issuing the preliminary injunction, committed reversible error by failing to require KBC to post security to cover damages incurred by Pertamina if the injunction is found to have been improvidently granted. As we decide this case on other grounds, we need not address this argument.

10

We review a district court's grant of a preliminary injunction for abuse of discretion.[14] Even though "the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed de novo."[15]

Generally, four requirements must be met to obtain a preliminary injunction:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.[16]

We have cautioned, however, that a preliminary injunction is "an extraordinary remedy" which should only be granted if the party seeking the injunction has "clearly carried the burden of persuasion" on all four requirements.[17] As a result, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule."[18]

---

[14] Mississippi Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

[15] Women's Med. Ctr. v. Bell, 248 F.3d 411, 419 (5th Cir. 2001).

[16] Canal Auth. v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974) (citations omitted).

[17] Mississippi Power & Light Co., 760 F.2d at 621.

[18] Id.

11

The dispute at issue here concerns the district court's decision to issue a foreign antisuit injunction, a particular subspecies of preliminary injunction. Although both the district court and the parties discussed all four prerequisites to the issuance of a traditional preliminary injunction, the suitability of such relief ultimately depends on considerations unique to antisuit injunctions.[19] As we conclude that the district court abused its discretion in granting the instant antisuit injunction, we need not address all the factors that generally are prerequisites to obtaining a preliminary injunction.

Finally, the district court's determination of its jurisdiction to enjoin Pertamina is an issue that we review de novo.[20] Still, we review the district court's order holding Pertamina in contempt, to the extent it still exists, only for abuse of discretion.[21]

B.    **THRESHOLD MATTERS**

    1.    **Jurisdiction**

---

[19] To the extent the traditional preliminary injunction test is appropriate, therefore, we only need address whether KBC showed a significant likelihood of success on the merits. The merits in this case, however, are not about whether Indonesia is an appropriate forum to litigate an annulment action, but instead whether KBC has demonstrated that the factors specific to an antisuit injunction weigh in favor of granting that injunction here.

[20] United States v. Lynch, 114 F.3d 61, 63 (5th Cir. 1997).

[21] F.D.I.C. v. LeGrand, 43 F.3d 163, 166 (5th Cir. 1995).

12

As an initial matter, Pertamina argues that the New York Convention divests the district court of authority to enjoin a party from proceeding in a court of <u>primary</u> jurisdiction (here, Indonesia, at least according to Pertamina). The New York Convention governs the confirmation and enforcement of the Award and "mandates very different regimes for the review of arbitral awards (1) in the [countries] in which, or under the law of which, the award was made, and (2) in other [countries] where recognition and enforcement are sought."[22] Under the Convention, "the country in which, or under the [arbitration] law of which, [an] award was made" is said to have <u>primary</u> jurisdiction over the arbitration award.[23] All other signatory States are <u>secondary</u> jurisdictions, in which parties can only contest whether that State should enforce the arbitral award. The limitation of being a court of secondary jurisdiction, Pertamina contends, also deprives the district court of the competence to issue injunctive relief here.

It is well established, however, that normally "federal courts have the power to enjoin persons subject to their jurisdiction from prosecuting foreign suits."[24] Moreover, "[a]bsent the clearest

---

[22] <u>Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.</u>, 126 F.3d 15, 23 (2nd Cir. 1997).

[23] New York Convention, art. V(1)(e).

[24] <u>Kaepa, Inc. v. Achilles Corp.</u>, 76 F.3d 624, 626 (5th Cir. 1996); <u>see also</u> <u>Gau Shan Co. v. Bankers Trust Co.</u>, 956 F.2d 1349, 1352 (6th Cir. 1992); <u>China Trade & Dev. Corp. v. M.V. Choong Yong</u>, 837 F.2d 33, 35 (2nd Cir. 1987); <u>Laker Airways Ltd. v. Sabena</u>, 731 F.2d 909, 926 (D.C. Cir. 1984); <u>Seattle</u>

command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."[25] Under the New York Convention and Chapter 2 of the Federal Arbitration Act (the Convention's implementing legislation) federal courts maintain jurisdiction to hear cases like this.[26] Although these treaty obligations limit the grounds on which the court can refuse to enforce a foreign arbitral award, there is nothing in the Convention or implementing legislation that expressly limits the inherent authority of a federal court to grant injunctive relief with respect to a party over whom it has jurisdiction. Given the absence of an express provision, we discern no authority for holding that the New York Convention divests the district court of its inherent authority to issue an antisuit injunction.[27]

2. **Mootness**

---

Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 855 (9th Cir. 1981).

[25] Califano v. Yamasaki, 442 U.S. 682, 705 (1979) (citing Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946); Scripps-Howard Radio v. FCC, 316 U.S. 4, 9-11 (1942)).

[26] 9 U.S.C. § 203 (providing that a "proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States").

[27] We need not, and thus do not, resolve the issue whether a set of circumstances might exist under which a secondary enforcement court under the New York Convention would be justified in imposing an antisuit injunction.

Guided by the constitutional command in Article III that our power extends only to actual cases or controversies, we require that an actual controversy exist at every stage in the judicial process.[28] Federal courts "may not give opinions upon moot questions or abstract propositions."[29] Thus, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed."[30] We have similarly recognized that "[a] claim becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."[31]

KBC contends that Pertamina's appeal of the district court's April 26, 2002 preliminary injunction is moot because the Indonesian court granted the annulment and injunctive relief that KBC sought to prevent. We have recognized, however, that "the collateral consequences doctrine serves to prevent mootness when the violation in question may cause continuing harm and the court

---

[28] In re Taylor, 916 F.2d 1027, 1028 (5th Cir. 1990).

[29] Calderon v. Moore, 518 U.S. 149, 150 (1996) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)).

[30] See Church of Scientology v. United States, 506 U.S. 9, 12 (1992) (citation and internal quotation marks omitted).

[31] Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries, 177 F.3d 380, 383 (5th Cir. 1999).

15

is capable of preventing such harm."[32]   Thus, as long as there is some interest in the outcome for which effective relief is available, the case is not moot.[33]

In this case, even though KBC may not have been successful in avoiding the Indonesian court's annulment and injunction, there are aspects of both the Indonesian court's injunction and the district court's injunction that potentially could affect both parties to this dispute.   When the preliminary injunction superseded and subsumed the TRO and the contempt order, it prohibited Pertamina from substantively pursuing annulment in Indonesia and from collecting any fines associated with the Indonesian injunction, and it ordered Pertamina to indemnify KBC for any penalties arising from the Indonesian injunction.   Although the district court's efforts to keep Pertamina from securing an injunction in Indonesia may be moot, other aspects of the district court's preliminary injunction, particularly the portion of that order requiring indemnification, continue to give Pertamina a concrete interest in this dispute.[34]  Similarly, KBC is still potentially subject to both

---

[32] Dailey v. Vought Aircraft Co., 141 F.3d 224, 227 (5th Cir. 1998)

[33] See id.

[34] In addition, a second contempt motion is presently pending before the district court, this one relating to Pertamina's alleged violation of this preliminary injunction and other subsequent orders enjoining Pertamina from taking substantive steps in the Indonesian action.  The district court has indicated that it will not rule on the second contempt motion until we rule on the propriety of the

16

the fines and the penalties imposed by the Indonesian court, and therefore maintains an interest in affirming the indemnification aspects of the district court's preliminary injunction order. For these reasons, we hold that Pertamina's appeal of the preliminary injunction is not moot.

C.  **ANTISUIT INJUNCTION**

When a preliminary injunction takes the form of a foreign antisuit injunction, we are required to balance domestic judicial interests against concerns of international comity. In assessing whether an injunction is necessary, we weigh the need to "prevent vexatious or oppressive litigation"[35] and to "protect the court's jurisdiction"[36] against the need to defer to principles of international comity. We have noted, however, that notions of comity do not wholly dominate our analysis to the exclusion of these other concerns.[37]

1.  **Vexatiousness and Oppressiveness of Foreign Litigation**

In determining whether proceedings in another forum constitute vexatious or oppressive litigation, we have looked for the presence of several interrelated factors, including (1) "inequitable

preliminary injunction.

[35] Kaepa, Inc., 76 F.3d at 627.

[36] MacPhail v. Oceaneering Int'l, Inc., 302 F.3d 274, 277 (5th Cir. 2002).

[37] Kaepa, Inc., 76 F.3d at 627.

17

hardship" resulting from the foreign suit;[38] (2) the foreign suit's ability to "frustrate and delay the speedy and efficient determination of the cause";[39] and (3) the extent to which the foreign suit is duplicitous of the litigation in the United States.[40]

The district court concluded, and on appeal KBC continues to contend, that Indonesia is not a proper forum for an annulment action under the New York Convention, irrespective of Pertamina's apparently self-serving argument that Indonesia is a "primary" jurisdiction. To resolve the instant dispute, however, it is not necessary for us to address the Indonesian court's decision to issue its own injunction and to entertain an annulment action under the Convention. Several structural aspects of the New York Convention indicate that none of the factors that usually contribute to vexatiousness and oppressiveness are at play here.

When the Convention was drafted, one of its main purposes was to facilitate the enforcement of arbitration awards by enabling parties to enforce them in third countries without first having to obtain either confirmation of such awards or leave to enforce them from a court in the country of the arbitral situs.[41] Under the

---

[38] Id. (citation omitted).

[39] Id. (citation and internal quotation marks omitted).

[40] MacPhail, 302 F.3d at 277.

[41] See Albert Jan van den Berg, The New York Arbitration Convention of 1958: Toward a Uniform Judicial

Convention, a court maintains the discretion to enforce an arbitral award even when nullification proceedings are occurring in the country where the award was rendered.[42]  Furthermore, an American court and courts of other countries have enforced awards, or permitted their enforcement, despite prior annulment in courts of primary jurisdiction.[43]  Here, KBC was able to initiate proceedings

Interpretation, at 7, 9 (1981).  The antecedent Geneva Convention required an award to be final in the country were it was made before enforcement was possible in a third country, which was interpreted to mean that a court of the country of origin had to give leave to allow enforcement (also called the "double exequatur" problem).  Van den Berg, at 7.  The New York Convention resolved this problem by only requiring rewards to be "binding" on the parties rather than "final" in order for enforcement to occur in a court of secondary jurisdiction. Id. at 9; Alghanim, 126 F.3d at 22 (recognizing the New York Convention's change in no longer requiring recognition in the rendering state before enforcement in a court of secondary jurisdiction was possible).

[42] Article VI grants an enforcement court discretion to enforce an award even though annulment proceedings may be taking place elsewhere.  New York Convention, art. VI (providing that an enforcement court "may, if it considers it proper" stay its enforcement proceedings while an annulment action takes place elsewhere).  See Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1071 (1961) (explaining that as a "reasonable complement to Article V(1)(e)" Article VI is "wholly discretionary, and the enforcing State is free to refuse adjournment and to enforce the award, nullification proceedings in the rendering State notwithstanding").

[43] See Chromalloy Aeroservices v. Arab Republic of Egypt, 939 F.Supp. 907, 909-13 (D.D.C. 1996) (enforcing an arbitral award made in Egypt despite annulment of the award by Egyptian courts, in part because Article V only makes refusal to enforce discretionary, and in part because Article VII enables a secondary jurisdiction to enforce an

19

in a secondary jurisdiction (the United States) to enforce the Award before a court of primary jurisdiction (Switzerland) had ruled on Pertamina's appeal of the Award.

By allowing concurrent enforcement and annulment actions, as well as simultaneous enforcement actions in third countries, the Convention necessarily envisions multiple proceedings that address the same substantive challenges to an arbitral award. For instance, Article (V)(1)(d) enables a losing party to challenge enforcement on the grounds that the arbitral panel did not obey the law of the arbitral situs, i.e., the lex arbitri, even though such a claim would undoubtably be raised in annulment proceedings in the rendering State itself. In addition, this case illustrates that enforcement proceedings in multiple secondary-jurisdiction states can address the same substantive issues. As noted, in addition to the U.S. proceeding, KBC has initiated enforcement actions in Canada and Singapore, and has already secured enforcement in Hong Kong. Although KBC contends that other courts will give res judicata effect to U.S. enforcement, the recent decision of the High Court of the Hong Kong Special Administrative Region Court of First Instance demonstrates that other enforcement courts can and

award if allowed by its domestic law). See also Domenico Di Pietro and Martin Platte, Enforcement of International Arbitration Awards: The New York Convention of 1958, at 169–70 (2001) (discussing a court's discretion to enforce an award despite annulment elsewhere and listing several examples of the exercise of such discretion in other national courts).

20

sometimes do conduct their own independent analyses of substantive challenges to the enforcement of the foreign award.[44] In short, multiple judicial proceedings on the same legal issues are characteristic of the confirmation and enforcement of international arbitral awards under the Convention.

Another important aspect of the New York Convention is its assigning of different roles to national courts to carry out the aims of the treaty. Articles IV and V of the Convention specify the procedures for courts of secondary jurisdictions to follow when deciding whether to enforce a foreign arbitral award. Article IV provides that a party can obtain enforcement of its award by furnishing to the putative enforcement court the authenticated award and the original arbitration agreement (or a certified copy of both).[45] Article V, in turn, enumerates specific grounds on which the court <u>may</u> refuse enforcement if the party contesting enforcement provides proof sufficient to meet one of the bases for refusal.[46]

In contrast to the limited authority of secondary-jurisdiction courts to review the arbitral award, courts of primary jurisdiction, usually the courts of the country of the arbitral

---

[44] <u>Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara</u>, (High Court of the Hong Kong Special Administrative Region Court of First Instance, March 27, 2003) [hereinafter "Hong Kong decision"]

[45] New York Convention, art. IV(1).

[46] Art. V.

situs, have much broader discretion to set aside an award. By its silence on the matter, the Convention does not restrict the grounds on which primary-jurisdiction courts may annul an award, thereby leaving to a primary jurisdiction's local law the decision whether to set aside an award.[47] Consequently, even though courts of a <u>primary</u> jurisdiction may apply their own domestic law when evaluating an attempt to annul or set aside an arbitral award, courts in countries of <u>secondary</u> jurisdiction may refuse enforcement only on the limited grounds specified in Article V.[48]

When we take into consideration these features of the New York Convention, we see that none of the factors that support antisuit injunctions are strong here. First, as the Convention already provides for multiple simultaneous proceedings, it is difficult to envision how court proceedings in Indonesia could amount to an inequitable hardship. Not only did KBC contract to arbitrate its dispute in a foreign country (Switzerland), but it also instituted

---

[47] Di Pietro, at 169 (explaining that by failing to restrict the grounds for setting aside an award in the rendering State, the Convention left the matter to that State's domestic law, a problem described as the "anathema of local particularities"); Quigley, at 1070 (explaining that one reason the Convention failed to establish grounds for annulment in a rendering State is that it would have been considered "meddling with national procedure for handling domestic awards").

[48] <u>Alghanim</u>, F.3d at 23. As described <u>infra</u>, however, enforcement courts do maintain discretion to enforce an award despite annulment elsewhere. Furthermore, although a primary jurisdiction maintains more bases on which to set aside an award, several likely track the grounds provided for in Article V.

22

enforcement proceedings in several countries, including the United States.  Indeed, but for Pertamina's initiation of a law suit in Indonesia, or perceived bias there, KBC conceivably might have attempted enforcement there as well.

It is also uncertain whether the financial hardship about which KBC complains will ever materialize.  The Indonesian injunction imposes fines of $500,000 per day on KBC for as long as it pursues enforcement of the award.  In challenging the contempt order in district court, however, Pertamina indicated, based on advice from Indonesian counsel, that the injunction is unenforceable until Pertamina seeks permission from a higher Indonesian court to enforce it; and Pertamina has promised the district court that it will not pursue enforcement of the Indonesia injunction.  Even if Pertamina were to initiate proceedings to enforce this financial penalty, and the Indonesian court were to fine KBC for its enforcement efforts <u>outside</u> of Indonesia,[49] it is anything but clear that this would cause KBC financial hardship: There is no record evidence that KBC has substantial assets in Indonesia.

Although it is always possible for Pertamina to pursue enforcement of the fines in third countries, it seems extremely

---

[49] Pertamina has also introduced into the record its Indonesian legal counsel's opinion that the Indonesian court injunction only concerns KBC's attempts to enforce the arbitral award in Indonesia, not its actions elsewhere in the world, because as a general rule injunctions issued by Indonesian court do not have extraterritorial effect.

unlikely that any country would countenance such a claim, given Pertamina's dubious behavior throughout this process.[50] Furthermore, even if KBC should have substantial assets in Indonesia, it is arguable that Pertamina would have found another reason to convince Indonesian courts to seize those assets. Pertamina could have sought monetary relief in the Indonesian courts regardless of the basis for KBC's claims elsewhere, and Indonesian courts, if truly determined to protect Pertamina at any cost, likely would have been willing to grant the relief requested. Nevertheless, as a court of secondary jurisdiction under the New York Convention, charged only with enforcing or refusing to enforce a foreign arbitral award, it is not the district court's burden or ours to protect KBC from all the legal hardships it might undergo

---

[50] When KBC first attempted to enforce its award in the district court, Pertamina requested that the district court stay the proceedings pending the outcome of Swiss court proceedings. In making this request, as well as in other submissions to the district court, Pertamina continuously represented to the district court that Swiss arbitral law governed the arbitration. Indeed, the district court admitted that it partially relied on these representations when it slowed the enforcement proceedings. Pertamina also apparently made similar representations to the arbitral panel itself. Only after Swiss courts had dismissed Pertamina's appeals, and the district court enforced the award in favor of KBC, did Pertamina file suit in Indonesian court. Regardless of its reasons for the delay, its complete silence as to its ability to file in Indonesian court (based on the applicability of Indonesian arbitral law) throughout the span of litigation, is certainly sufficient grounds to find Pertamina's behavior dubious and somewhat deceptive. Whether or not the Indonesian court is a proper forum, Pertamina implied more than once that Swiss law was the applicable arbitral law in this dispute.

in a foreign country as a result of this foreign arbitration or the international commercial dispute that spawned it.

Second, there is little evidence that the Indonesian injunction or annulment action will "frustrate and delay the speedy and efficient determination of the cause."[51]  Although it may occasion some temporary delay, an Indonesian annulment is wholly ineffective in curtailing the ability of any court of secondary jurisdiction, including U.S. courts, to enforce the arbitral award. As an enforcement jurisdiction, our courts have discretion under the Convention to enforce an award despite annulment in another country, and have exercised that discretion in the past.[52]  The discretion to enforce in this case is even more well-founded, as a Swiss court with indisputable primary jurisdiction under the Convention has already dismissed Pertamina's challenge to the Award.  Furthermore, even though an Indonesian annulment may force secondary-jurisdiction courts to consider that judgment in deciding whether to enforce the Award, they nonetheless must undertake an enforcement analysis.  This slight additional expenditure of judicial resources seems inconsequential, as annulment is only one of several grounds on which recognition and enforcement may be

---

[51] Kaepa, Inc., 76 F.3d at 627 (citation and internal quotation marks omitted).

[52] Chromalloy Aeroservices, 939 F.Supp. 907.

refused;[53] and some of these grounds have already been raised by Pertamina in the district court as well as in the enforcement proceeding in Hong Kong.[54]

Third, the duplication inherent in the Indonesian proceedings is less problematic than it might be otherwise, as the Convention already allows for multiple proceedings addressing the same or similar legal bases against enforcement and confirmation. Additionally, to any extent that the Indonesian courts might be acting as legitimate courts of primary jurisdiction, such courts would have domestic law grounds on which to analyze the propriety of a foreign arbitral award, but which, under the Convention, may not be relied on by enforcement courts in other States. Thus, assuming arguendo that the Indonesian courts might somehow be

---

[53] See New York Convention, art. V(1) (other bases for refusing enforcement include, inter alia, that (1) the parties were under some incapacity, or the agreement was not valid under the arbitral law chosen by the parties or the law of the country where the award was made; (2) the party against whom the award is invoked was given insufficient notice of the arbitration proceedings or was unable to present his case; (3) the award contains decisions on matters that go beyond the scope of the submission to arbitration; and (4) the composition of the arbitral authority or the arbitral procedure violated the agreement of the parties or the law of the country where the arbitration took place). Even though many of these reasons may have no basis of fact in this dispute, they nonetheless constitute arguments that an enforcement court may very well have to confront in its proceedings.

[54] Karaha Bodas Co., 190 F. Supp. 2d at 945-957; Hong Kong Decision, (High Court of the Hong Kong Special Administrative Region Court of First Instance, March 27, 2003).

deemed to be courts of primary jurisdiction, they still would not precisely duplicate the enforcement proceedings that took place in the United States.

Finally, the Indonesian court proceedings do not threaten the integrity of the district court's jurisdiction or its Judgment enforcing the Award. As courts of secondary jurisdiction here, the authority of U.S. courts is restricted to enforcing or refusing to enforce the arbitral award under the Convention. The district court has chosen to enforce the Award, and the Indonesian annulment only has an effect here to the extent that our courts chose to recognize it. Thus, the integrity of our jurisdiction and the district court's judgment will not be affected unless we decide that the Indonesian annulment is in fact valid <u>and</u> that this annulment outweighs the Swiss court's confirmation of the Award. Otherwise, under the Convention, we maintain the discretionary authority to ignore the Indonesian proceedings and affirm the district court's decision to enforce the Award here. Furthermore, the integrity of the district court's decision vis-à-vis other secondary enforcement jurisdictions is not harmed, as these courts are prone to conduct their own independent enforcement analyses anyway. Hong Kong's recent decision to enforce the Award not only supports this conclusion, but also illustrates that an Indonesian

27

court's annulment fails to jeopardize enforcement of the Award elsewhere as well.[55]

## 2. **Interests in International Comity**

Balanced against the scant vexatiousness and oppressiveness of Pertamina's acts are the not-insubstantial interests in preserving international comity. Neither a matter of legal obligation nor of mere courtesy, comity has long counseled courts to give effect, whenever possible, to the executive, legislative and judicial acts of a foreign sovereign so as to strengthen international cooperation.[56] The doctrine of comity contains a rule of "local restraint" which guides courts reasonably to restrict the extraterritorial application of sovereign power.[57] In this vein, we have impliedly recognized the importance of comity when a case implicates public international issues and when prior steps in

---

[55] See Hong Kong decision (stating that "the fact that the court in Indonesia has now annulled the award under its own law is also a matter which has no effect on this court's task").

[56] Hilton v. Guyot, 159 U.S. 113, 163-64 (1895) (describing comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws").

[57] Harold G. Maier, Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law, 76 Am. J. Int'l L. 280, 281 (1982). See also Restatement (Third) of Foreign Relations, § 403, rptr's n. 2 (1987) (stating that courts have invoked "comity" in "approaching challenges to the reach of United States jurisdiction to prescribe").

resolving a dispute have taken place in international fora.[58]  The

immediate issue in this case is whether an injunction, which

effectively attempts to arrest the judicial proceedings of another

foreign sovereign — here, Indonesia — sufficiently upsets our

interests in preserving comity among nations.

The district court concluded that its injunction did not

"impinge on another court's jurisdiction or cause comity concerns,"

because it had already issued a final judgment, thereby minimizing

the reason to defer to proceedings elsewhere, and because Indonesia

was not a proper court of primary jurisdiction under the

Convention.  The district court reasoned that, in fact, it was the

Indonesian action that upset comity by permitting the relitigation

of issues already decided by the district court, thereby

threatening to erode the effectiveness of the district court's

judgment, both here and abroad.

We agree that there is strong evidence in this instance

favoring Switzerland as the paramount country of primary

jurisdiction under the Convention.  The district court and the Hong

Kong Court of First Instance suggest at least three potential bases

for finding that Swiss law effectively constitutes the <u>lex arbitri</u>

of this case:  (1) Pertamina previously argued in favor of Swiss

---

[58] <u>See</u> <u>Kaepa, Inc.</u>, 76 F.3d at 627 (finding no threat to
interstate relations, and thus no need to defer to notions
of comity, when "no public international issue is
implicated," and when "the dispute has been long and firmly
ensconced within the confines of the United States judicial
system").

29

arbitral law, which may reveal the parties' original contractual intentions to apply Swiss law in arbitration; (2) the parties failed clearly to choose Indonesian arbitral law in their agreement, as may be required by international law when parties want to select an arbitral law other than that of the arbitral situs; and, finally, (3) Pertamina may be judicially estopped from arguing otherwise because it contended strenuously in the district court, proffering arguments on which the court relied, that Swiss arbitral law applies to this dispute. Whether Switzerland is the only country of primary jurisdiction (and, impliedly, whether Indonesia could be a proper forum for annulment), however, is an issue that is not directly before us today. That issue arises under Article V of the Convention as a defense to enforcement, which the district court decided earlier, and which was on separate appeal before another panel of this Court and thereafter before the district court on remand.

Nevertheless, even if the Indonesian court acted wrongly in its decision to annul the Award as a purported court of primary jurisdiction under the New York Convention, we need not directly address the propriety of that court's injunction and annulment. Contrary to the district court's conclusions, legal action in Indonesia, regardless of its legitimacy, does not interfere with the ability of U.S. courts, or courts of any other enforcement jurisdictions for that matter, to enforce a foreign arbitral award. Furthermore, as we have explained, the "relitigation" of issues is

30

characteristic of the Convention's confirmation and enforcement scheme. Lastly, the district court's "final judgment" is not truly a decision on the merits; rather, it is an order to enforce an award resulting from litigation elsewhere, which is not necessarily given res judicata effect in foreign jurisdictions.[59]

This case also differs significantly from Kaepa, in which we found comity concerns insignificant because that case dealt with a contractual dispute between private parties and was "long and firmly ensconced within the confines of the United States judicial system."[60] Unlike the foreign litigation at issue in Kaepa, this case implicates public international issues and has been litigated chiefly in non-American fora.

The instant dispute implicates three public international issues. First, this is not a purely private dispute, as Pertamina is wholly owned by the GOI, and the claims at issue in the arbitration arose from sovereign acts of that government. Second, even if Pertamina is acting in bad faith by pursuing annulment in

---

[59] Proceedings in multiple jurisdictions normally should be allowed at least until judgment is reached in one, at which point res judicata can be pleaded in the other. Laker Airways Ltd. v. Sabena, 731 F.2d 909, 926-27 (2d Cir. 1984). The implication of this principle is that comity concerns diminish once a final judgment has been reached in one court. See id. at 928. This rule-of-thumb is inapplicable here, however, where the U.S. court acts merely as a secondary-jurisdiction court under the Convention; it only enforces, or refuses to enforce, awards arbitrated elsewhere, and those decisions do not automatically receive res judicata effect.

[60] 76 F.3d at 627.

Indonesia (as it appears to be), the district court's attempt to enjoin Pertamina effectively translates into an attempt to enjoin the Indonesian court itself and to interfere with the sovereign actions of the GOI.[61] When viewed in a vacuum, enjoining Pertamina might appear to be the right answer in this case; but when viewed in total context, its effect tends to clash with the general principle that a sovereign country has the competence to determine its own jurisdiction and grant the kinds of relief it deems appropriate.

Third, and perhaps most importantly, allowing such an injunction to stand could set an undesirable precedent under the Convention, permitting a secondary jurisdiction to impose penalties on a party when it disagrees with that party's attempt to challenge an award in another country. It is at least conceivable that by using the district court's decision as persuasive authority, an enforcement court in a future dispute might attempt to enjoin proceedings in countries with arguable primary jurisdiction, or in countries with clear primary jurisdiction but with which the

---

[61] We recognize that the district court was familiar with its role under the New York Convention, and was attempting only to thwart the actions of Pertamina and not Indonesia courts generally. Nonetheless, after review of the record and the Indonesian court's holdings, we conclude that an attempt to enjoin Pertamina has the undeniable effect, even if unintended, of an attempt to enjoin the courts of Indonesia themselves. See Donovan v. City of Dallas, 377 U.S. 408, 413 (1964) (citations omitted) (indicating that an injunction issued at a party does not avoid the tension such an injunction creates with the other court exercising jurisdiction over that party).

32

enforcement country's court radically disagrees.  Reaching out to enjoin proceedings abroad cuts against the Convention's grants of separate and limited roles of primary-jurisdiction courts to annul awards, and of secondary-jurisdiction courts to enforce, or refuse to enforce, awards in their own countries.[62]  In sum, an injunction here is likely to have the practical effect of showing a lack of mutual respect for the judicial proceedings of other sovereign nations and to demonstrate an assertion of authority not contemplated by the New York Convention.

In addition, the procedural chronology of this case illustrates the inherently international character of the proceedings themselves.  This case (1) arises from contracts negotiated and allegedly breached in Indonesia, (2) was arbitrated and litigated originally in Switzerland, and, (3) involves primarily non-United States parties.  Although enforcement of the Award in the United States may well satisfy much or even all of KBC's claim, our courts are nonetheless courts of secondary jurisdiction, empowered only to enforce or refuse to enforce the

---

[62] As the Supreme Court has indicated, "[t]he utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own."  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 639, n. 21 (1985). Even though the Mitsubishi court was primarily addressing the arbitrability of disputes raising anti-trust issues, its guidance nevertheless still applies here, where exercise of a court's traditional equitable power threatens to upset the Convention's assignment of limited, distinct roles to national courts in the confirmation and enforcement process.

33

foreign award, and then only within the United States. Thus, the courts of this country do not maintain nearly as meaningful an interest in the resolution of this dispute, other than to give effect to a foreign arbitral award, as they do in the great majority of the cases they hear.

It is true that Pertamina is likely in the wrong here, and that Indonesia's injunction and annulment may violate comity and the spirit of the Convention much more than would the district court's injunction. In reality, however, a U.S. court's injunction is powerless to prevent or terminate such foreign actions. The Convention already appears to allow for some degree of forum shopping,[63] and, as with many treaties, the efficacy of the Convention depends in large part on the good faith of its sovereign signatories.[64] Upholding the district court's injunction could only further exacerbate the problem, diplomatically if not legally as well.

3. **Summary**

---

[63] See Quigley, at 1070 (finding that Article V.2(a) —— enabling an enforcement court to refuse recognition and enforcement if the subject matter of the dispute is not amenable to settlement by arbitration under the arbitration law of the enforcement country —— grants parties who succeeded in arbitration a certain degree of forum-shopping when choosing where to enforce the award).

[64] See id. (arguing that an enforcement country's authority in Article V.2(b) to refuse enforcement if contrary to its public policy "has the effect of relegating the ultimate decision on the efficacy of the Convention to the good faith of the Contracting States").

Although Indonesia has already purported to annul the Award, such annulment in no way affects the authority of the district court (or this court) to enforce the Award in the United States —— which is, after all, the principal task of a U.S. court under the Convention. And, the Award can be enforced here with or without the district court's injunction against Pertamina. Similarly, other enforcement jurisdictions will be forced independently to weigh the Indonesian annulment with or without awareness of a U.S. court's injunction. Inasmuch as the Convention provides for multiple proceedings and a more limited role for enforcement jurisdictions, Pertamina's actions in Indonesia, even if spurious, are less vexatious and oppressive than they would be outside of this treaty structure. Finally, given the absence of a practical, positive effect that any injunction could have, more weighty considerations of comity dictate that the better course for U.S. courts to follow is to avoid the appearance of reaching out to interfere with the judicial proceedings in another country and to avoid stepping too far outside its limited role under the Convention.

D.   **THE CONTEMPT ORDER**

Although the district court denied Pertamina's motion to purge contempt, it expressly held that the TRO and contempt order were "superceded by th[e] preliminary injunction, and all restraints not expressly set forth in [the injunction were] dissolved." Given this pronouncement, the only district court order that should be

35

subject to review on appeal to us is the preliminary injunction. By reversing and vacating the preliminary injunction, we addressed the substantive provisions of the contempt order, most importantly the indemnification provisions, that were included in the injunction, thereby making it unnecessary for us to address now the contempt order itself. Nevertheless, because the parties chose to focus separately on the contempt order, and because we want to make clear that no part of the contempt order remains valid, we briefly address the contempt order as well.

In United States v. United Mine Workers of America, the Supreme Court held that even though criminal contempt orders endure if the injunction on which they are based is vacated or found moot, "[t]he right to remedial relief [through a civil contempt order] falls with an injunction which events prove was erroneously issued."[65] We and several other circuits have expressly adopted this rule.[66]

---

[65] 330 U.S. 258, 294-95 (1947) ("It does not follow, of course, that simply because a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal, that the plaintiff in the action may profit by way of a fine imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order.).

[66] United States Steel Corp. v. United Mine Workers, 519 F.2d 1236, 1249 (5th Cir. 1975) (recognizing and applying the rule that "disobedience of a void preliminary injunction does not carry civil contempt penalties"). See also Klett v. Pim, 965 F.2d 587, 590 (8th Cir. 1992) (finding that "[c]ompensatory civil contempt does not survive if the underlying injunction is vacated because it was issued erroneously"); Hampton Tree Farms, Inc. v. Yeutter, 956 F.2d 869, 871 (9th Cir. 1992) (finding that "once an injunction in a civil case has been invalidated, rights granted under

Given the rule's clarity, the only remaining question is whether the contempt order that the district court imposed on Pertamina is civil or criminal.  The Supreme Court has indicated that "[i]t is not the fact of punishment but rather its character and purpose that often serve to distinguish civil from criminal contempt."[67]  Thus, we have stated that "[t]he test for determining the civil or criminal nature of a contempt order is the apparent purpose of the trial court in issuing the contempt judgment."[68]  When the purpose is punitive or the injunction is "designed to vindicate the authority of the court," the contempt order is criminal, but when the court is coercive or remedial in its purpose, the order is civil.[69]

In the instant case, the district court expressly held Pertamina to be in civil contempt of court.  In addition, although the district court was motivated to maintain the status quo and protect its own authority, the express commands of the contempt order were directed at shepherding Pertamina's future actions, not

the injunction no longer exist and cannot be enforced"); Blaylock v. Cheker Oil Co., 547 F.2d 962, 966 (6th Cir. 1976) (recognizing and applying from United Mine Workers rule); Latrobe Steel Co. v. United Steel Workers, 545 F.2d 1336, 1345 (3d Cir. 1976) (affirming rule that "compensatory civil contempt does not survive the abrogation of the underlying decree").

[67] Shillitani v. United States, 384 U.S. 364, 369 (1966) (citation and internal quotation marks omitted).

[68] In re Hunt, 754 F.2d 1290, 1293 (5th Cir. 1985).

[69] Id. (citation and internal quotation marks omitted).

necessarily punishing it for past misbehavior: (1) The order directed Pertamina's counsel to withdraw the application for injunctive relief that was pending before the Indonesian court; (2) it directed Pertamina to request that the Indonesian courts vacate any court-ordered injunctive relief; (3) it directed Pertamina to indemnify KBC for any future monetary penalties imposed by Indonesian court; (4) it declared that KBC has no obligation to pay Pertamina any penalties that might be imposed by Indonesian courts; and (5) it ordered Pertamina to pay KBC for fines imposed by any other court because of KBC's violation of the Indonesian court injunction and to do so before KBC's payment is due to such courts. In short, most, if not all, of the penalties imposed on Pertamina by the district court's contempt order were meant to coerce Pertamina to end all actions in Indonesian courts and refrain from acting on any decrees of those courts.[70]  As best we can tell, Pertamina's apparent failure to stop the Indonesian proceedings never resulted in immediate monetary penalties against KBC.

The obvious purpose of the district's court's contempt order was to constrain Pertamina to comply with the court's substantive orders rather than to punish Pertamina for any past misconduct. Coupled with the district court's express civil label, these particular aspects of the contempt order satisfy us that it is truly civil in character, which requires us to vacate that order,

---

[70] The Preliminary Injunction Order substantially repeated the demands upon Pertamina.

to the extent it still persists, along with the preliminary injunction, as dictated by the criminal/civil dichotomy of <u>United Mine Workers</u>.[71]

### III. CONCLUSION

We empathize with the district court and share its frustrations at the acts of Pertamina and its counsel. For the foregoing reasons, however, we are constrained to reverse the district court and vacate the preliminary injunction and, as necessary, the contempt order against Pertamina.

REVERSED; PRELIMINARY INJUNCTION (and ORDER OF CONTEMPT) VACATED.

---

[71] 330 U.S. at 294-95.