**In the Matter of An ARBITRATION BETWEEN KARAHA BODAS COMPANY, L.L.C., Petitioner,**

v.

**PERUSAHAAN PERTAMBANGAN MINYAK DAN GAS BUMI NEGARA ("PERTAMINA"), Respondent.**

**No. 21–MC–00098 (TPG).**

United States District Court, S.D. New York.

Dec. 8, 2006.

Christopher F. Dugan, Paul, Hastings, Janofsky & Walker LLP, Washington, DC, for Petitioner.

Henry Weisburg, Shearman & Sterling LLP, New York City, for Respondent.

## *OPINION*

GRIESA, District Judge.

Karaha Bodas Company ("KBC") moves for an order prohibiting Pertamina from engaging in certain legal proceedings in the Cayman Islands and from initiating similar proceedings in other jurisdictions. The motion is granted. In addition, the Court will enter a declaratory judgment based on certain conclusions reached in this opinion.

### *Facts*

**The Arbitral Award**

In 1994 KBC, a Cayman Islands limited liability company formed by two American power companies and other investors, executed two contracts with Pertamina, an oil and gas company owned and controlled by the Republic of Indonesia. The contracts established a joint venture for the exploration of geothermal energy resources in the Karaha area of West Java, Indonesia. In 1997 the projects were suspended by Indonesian Presidential Decrees. As a result, on April 30, 1998, KBC commenced arbitration proceedings in Switzerland for breach of contract by Pertamina. On December 18, 2000, the Tribunal awarded KBC $261.1 million.

In February 2001 Pertamina attempted to challenge the award in the Swiss Supreme Court, on grounds that are not ex-

plained on the record in the present motion. The Swiss court denied Pertamina's application for failure to timely pay court fees. Pertamina next challenged the award in the Jakarta District Court in Indonesia. The Jakarta court granted Pertamina's request to annul the award in August 2002, but on March 23, 2004, the Indonesian Supreme Court reversed.

## Confirmation Proceedings in the United States

In early 2001, KBC brought an action in the United States District Court for the Southern District of Texas to confirm the Arbitral Award. On December 4, 2001, that court granted summary judgment in favor of KBC and confirmed the award. Pertamina filed a notice of appeal, and a year later—months after the briefing on the appeal was concluded—Pertamina moved under Fed.R.Civ.P. 60(b) in the Texas district court to set aside the judgment. Pertamina sought to set aside the judgment because (1) there was newly discovered evidence of political risk insurance coverage pursuant to which KBC's investors were paid $75 million and (2) the Jakarta District Court annulled the underlying Arbitral Award in August 2002. The Fifth Circuit remanded the case to the district court to consider the merits of the Rule 60(b) motion. The district court denied Pertamina's motion in two separate opinions on April 16 and May 30, 2003. The Fifth Circuit on March 23, 2004, affirmed both the district court's December 2001 judgment and the Rule 60(b) decisions of 2003. On October 4, 2004 the United States Supreme Court denied certiorari.

## Pertamina's Claim of Fraud

Pertamina claims that KBC committed fraud in connection with the joint venture and the arbitration. It is important to note that Pertamina's claim of fraud was not presented in the arbitration itself or in any of the proceedings described above in the Swiss Supreme Court, the Jakarta District Court, the Southern District of Texas, the Fifth Circuit, or the United States Supreme Court. However, the fraud claim was presented in certain proceedings in Hong Kong and Singapore, as will be described. More importantly, Pertamina's claim of fraud is the basis of its action in the Cayman Islands, which is the subject of the present motion.

Specifically, Pertamina alleges that KBC fraudulently overstated the size of geothermal resources in 1997 and relied on those falsehoods in the arbitration proceedings. In its Statement of Claim dated October 6, 2006, filed with the Cayman Islands court, Pertamina attempts to present a detailed list of the specifics of the alleged fraud. But the details all relate the basic claim that KBC overstated the size of geothermal resources. It should be noted that, although there is no indication that the claim of fraud was literally presented to the Arbitral Tribunal, the issue of the quantity of geothermal resources was surely put forward. Paragraph 129 of the Final Award describes the fact that Pertamina claimed that the representations made by KBC "were suspect since the quantities of reserves indicated" in one analysis by KBC "had been significantly increased without justification" in a later analysis. In paragraph 131, the Arbitral Tribunal recognizes the possibility that the amount of reserves put forward by KBC may have been overestimated, and states that the Tribunal would give weight to this circumstance in making the allowance for lost profits. The result was that, whereas KBC had claimed lost profits of $512.5 million, the Tribunal, in paragraph 136, only awarded $150 million.

Pertamina asserts that its claim of fraud is based upon new evidence. There is an issue about when Pertamina knew, or should have known, about this alleged new

evidence. Such evidence is in fact contained in documents turned over to Pertamina by KBC. The parties dispute when the documents were received by Pertamina. KBC claims that the documents were turned over in March 2001, when KBC relinquished its offices and files to Pertamina. However, Pertamina insists that the documents were not received until November 2002, when a KBC employee delivered twelve boxes of documents to Pertamina's Geothermal Office. Regardless, Pertamina asserts that "no one looked through them until August 2005 when Pertamina's advisors came and inspected them" (Statement of Bambang Kustono, October 13, 2006).

### Foreign Confirmation/Registration Proceedings

In addition to bringing the action in the federal court in Texas, KBC brought confirmation/registration proceedings in Hong Kong, Singapore and Canada. On March 27, 2003, the Hong Kong court granted KBC's application to register the award and denied Pertamina's attempt to set it aside. An appeal was partially heard in December 2003, but the appeal was adjourned pending the outcome of the Fifth Circuit's decision in the United States. The appeal was scheduled to be heard in February 2006. Pertamina filed a Supplementary Notice of Appeal, including allegations of fraud. The exact status of that matter is not clear. However, KBC recovered $898,682.90 in Hong Kong to be applied to the amount owed by Pertamina under the Arbitral Award.

On March 14, 2002 the High Court of the Republic of Singapore granted KBC's application to register its award. Pertamina's application to set aside the order, also filed in 2002, was held in abeyance pending the outcome of proceedings in the United States. In late January 2006, Pertamina informed the Singapore court of its fraud allegations in a conference. KBC made various applications to the Singapore court in an attempt to defer further litigation until after the termination of proceedings in the United States, but the court denied KBC's applications. Eventually, KBC voluntarily dismissed its action in Singapore.

On December 8, 2004, a Canadian court granted summary judgment in favor of KBC and confirmed the award. Pertamina's appeal is currently still pending. There is no indication that Pertamina has brought up its fraud allegations in the Canadian proceeding.

### Execution Proceedings in the Southern District of New York

When Pertamina appealed the Texas district court's decision in early 2002, it declined to file a supersedeas bond pursuant to Fed.R.Civ.P. 62(d) in order to obtain a stay of the judgment pending appeal. As a result, KBC sought and was granted permission by the district court to register its judgment in other judicial districts in the United States under 28 U.S.C. § 1963. On February 22, 2002, KBC registered its Texas district court judgment with the United States District Court for the Southern District of New York, and commenced execution proceedings. On the same day, the Southern District issued ex parte writs of execution permitting KBC to serve restraining notices upon a number of banks in New York, and also served orders on Pertamina to show cause why KBC could not execute upon any property of Pertamina within this jurisdiction in satisfaction of the judgment. KBC promptly issued notices to, inter alia, the Bank of America and the Bank of New York to restrain funds flowing through twenty-four trust accounts maintained in Pertamina's name at those banks in this district.

In March 2002, the Ministry of Finance of the Republic of Indonesia filed a motion to quash the restraining notices and the writs of execution arguing that it—and not

Pertamina—owned the restrained assets. To the extent that Pertamina owned the funds, KBC could have execution on its judgment, but only to that extent. On April 24, 2002, this Court held that, with respect to fifteen of the twenty-four accounts, Pertamina only owned a portion of the funds in the accounts. The fifteen accounts ("Adjudicated Accounts") contained revenues from the sale of Liquefied Natural Gas, and the Court held that Pertamina only had a property right in those funds to the extent of its Retention Fee. The remainder belonged to the Ministry. The Retention Fee, explained in detail in other opinions of this Court, is Pertamina's share of income from projects it undertakes with private contractors. Additionally, the Court noted that the record was insufficient to determine ownership of the funds in the remaining nine accounts. The Court certified the April 24 order for immediate appeal and stayed it pending the appeal. The stay prevented actual disbursement to KBC. The Second Circuit affirmed on December 10, 2002, but ordered this Court to continue the stay until the parties' rights in all of the funds were determined.

After the Second Circuit's December 2002 ruling, Pertamina and the Ministry sought to limit the amount of the Retention Fees subject to the restraining notices by contending that the effect of the restraining notices as to the Adjudicated Accounts ceased in June 2002, rather than continuing through that year and thereafter, as argued by KBC. This issue was raised in motions made, briefed, and argued in 2003 in this Court. In an opinion on January 29, 2004, this Court held that the effect of the restraining notices did not terminate in June 2002, but continued through 2002 and into 2003, and would continue, until the amount of the judgment plus interest was secured.

On April 6, 2004, KBC filed a "Motion for Turnover of Retention Fees Accrued Through November 2003." This motion was precipitated by a November 21, 2003 letter sent from the Ministry to the Governor of the Bank of Indonesia terminating the payment of Retention Fees to Pertamina. More importantly, Pertamina and the Ministry took the position that the letter was a confirmation of prior legal enactments, which had already terminated the Retention Fees as of January 1, 2003. KBC argued to the contrary. On May 19, 2004, this Court held that Pertamina earned Retention Fees through November 21, 2003. The Court noted that the positions taken by Pertamina and the Ministry during all of the 2003 litigation were contrary to the position it now took in opposition to the Turnover Motion and as a result its assertion on the Turnover Motion could be given no weight. KBC's motion was granted but the Court ordered the actual turnover stayed in accordance with its previous orders.

On October 6, 2004, after two days of argument and testimony, the Court held that the funds restrained in the remaining "unadjudicated" accounts belonged to Pertamina. Then, on October 22, this Court issued its final judgment ordering a turnover of the amount of the award plus interest to KBC, but stayed the award pending appeal. The Second Circuit summarily affirmed the judgment on March 9, 2006. Pertamina then applied to the Supreme Court for certiorari.

KBC had moved to impose sanctions on Pertamina and its attorneys. Oral argument on this motion was held on August 25, 2006. In the course of the hearing, the Court asked whether, if the Supreme Court denied certiorari, the funds restrained in New York would be paid to KBC and there would be "no further issue." (Minutes pp. 14–15). The attorney

for KBC replied that there was a further issue that had come up recently in the proceedings brought by KBC in Singapore, where Pertamina raised the claim that KBC had obtained the Arbitral Award by fraud. The KBC attorney said that Pertamina had told the court in Singapore that if that court issued a finding of fraud, Pertamina "was going to start a new action in the United States to try to recover all the funds that had been paid, a new fraud action in the United States." In the sanctions hearing, the Court then questioned counsel for Pertamina:

[W]hat about that? Is there any intention to have further litigation, or can we end it? If the Supreme Court denies cert., will the money simply be paid to KBC or not?

The Pertamina attorney replied that he had no instructions to commence an action. The Court then asked for a more definite statement of Pertamina's position, as follows:

The question is, and I have absolutely a good reason for asking such a question in view of the record here, I want to know, assuming that the Supreme Court denies cert., I want to know if Pertamina will now agree to the payment of the judgment, which would mean the release of the funds which are now held to secure that judgment, immediate release.

(Minutes pp. 16–17). On August 28, 2006 the attorney for Pertamina wrote the Court as follows:

Pursuant to the Court's direction, we are writing to address the question posed by the Court at last Friday's hearing with respect to the payment of the outstanding portion of KBC's judgment by Pertamina. Our understanding of Your Honor's question is whether, in the event that the Supreme Court denies the petitions for certiorari filed by Pertamina and the

Ministry of Finance of the Republic of Indonesia, Pertamina will agree to the payment of KBC's judgment. We have been instructed by Pertamina to inform the Court and counsel for KBC that, in the event that the Supreme Court denies the pending petitions, and assuming that the Court issues a turnover order with respect to the restrained funds appropriate in form and amount, Pertamina will not object before this Court to the payment of the judgment.

On October 2, 2006 the Supreme Court denied Pertamina's certiorari petition.

### The Cayman Islands Action

A little over two weeks after the August 28 letter, on September 15 Pertamina commenced an action against KBC in the Grand Court of the Cayman Islands for fraud in connection with the joint venture and the arbitration. Pertamina's New York attorney wrote the Court on September 19, 2006 stating that he was "unaware on August 25 that such a proceeding was planned." Presumably the attorney meant August 28, the date of his letter. However, there can be no doubt about the fact that Pertamina was planning the Cayman Islands action as of August 28, and probably for a substantial period of time before that. Also, there can be no doubt about the fact that both Pertamina and its attorneys knew full well that the Court's questions were directed to finding out whether the Supreme Court's denial of certiorari would mean final termination of all litigation, so that KBC could be paid out of the funds restrained in New York. Obviously the Court did not know enough to ask specifically if Pertamina planned to bring a new action in the Cayman Islands. But an honest look at the Court's inquiry and an honest response would have led to the disclosure of the plan to bring such an action.

There was, of course, no such disclosure. The circumstances strongly support an inference that concealment by Pertamina was deliberate and with a purpose. Now that an action has been brought, Pertamina is asserting that this Court cannot interfere with such an action because such interference would tread on the sovereignty of a foreign state. Had the plan for an action been disclosed beforehand, there may well have been legal issues about how to deal with Pertamina's strategy, but the case law about anti-suit injunctions, now relied on by Pertamina, would not have been directly applicable.

Pertamina alleges in the Cayman Island action that KBC overstated the size of geothermal resources in 1997 and relied on those falsehoods in the arbitration proceedings. The statement of plaintiff's claim in the action is contained in the Writ of Summons, dated September 15, 2006, and signed by Pertamina's Cayman Islands attorney. Pertamina claims that the fraud of KBC affected various notices issued by KBC to Pertamina in 1997. Pertamina further contends that KBC was guilty of fraud in presenting the Notice of Arbitration dated April 30, 1998 and in the procuring of the Arbitral Award dated December 18, 2000, and that the fraud was "such as to vitiate the Arbitral Award." (Writ of Summons ¶ 1). Pertamina seeks damages, accounting, and restitution, as well as

> An injunction restraining the defendant . . . from (i) dealing with or disposing of, in any manner whatsoever, any sums received . . . as a consequence of the said fraud . . . and (ii) taking any steps whatsoever in furtherance of the said wrongs including . . . commencing or continuing or prosecuting or assisting in the prosecution of any proceedings directed to enforcing, whether by themselves or by assignment, and/or from receiving the benefit by enforcing, the Arbitral Award.

(Writ of Summons ¶ 9). On September 21 Pertamina filed an Amended Summons with the Cayman Islands court, requesting

> That the defendant . . . be restrained until the conclusion of the trial of this action or further order in the meantime from taking any steps to dispose or direct the disposal of any funds belonging to or in the name of or due to Plaintiff [Pertamina] collected or received by way of enforcement of the Arbitral Award dated 18 December 2000 entered in favor of Defendant [KBC] against the Plaintiff following the initiation of arbitration proceedings by the Defendant through the Notice of Arbitration dated 30 April 1998, . . .

(Am. Summons ¶ 2). The Amended Summons also requests that KBC be restrained in the terms of an attached Draft Order. This Draft Order, entitled "Injunction Prohibiting Disposal of Assets Worldwide," would prohibit KBC from disposing of its assets up to $316 million, whether in or outside the Cayman Islands, and specifically includes within the definition of assets, "any sums received or to be received by the Defendant pursuant to any order of the United States District Court for the Southern District of New York . . . pursuant to proceedings issued by the Defendant directed to enforcing the Arbitral Award."

Other materials relating to the Cayman Islands action, which have been filed by Pertamina on the current motion before the Southern District, are as follows:

> Affidavit of Simson Panjaitan, dated September 21, 2006.
> "Skeleton Argument," dated September 22, 2006.
> Amended Writ of Summons, dated October 6, 2006.

Statement of Claim, dated October 6, 2006.

As will be described more fully later in this opinion, an important, and perhaps essential, argument of Pertamina in opposing KBC's current motion is that the action in the Cayman Islands is not to set aside the Arbitral Award, but is "a totally new fraud claim." What has just been quoted from the pleadings in the Cayman Islands action bears, of course, on that issue. In addition, the Court notes the portion of the document entitled "Skeleton Argument," dealing with the remedies sought in the Cayman Island proceedings. According to paragraph 7 of that document, Pertamina is seeking damages and ancillary orders. The damages sought are *the amount of the Arbitral Award,* Pertamina's costs in the arbitration, and interest on those sums. As to ancillary orders, paragraph 7 states that "a finding of fraud would mean that the award is vitiated by fraud and a nullity," which "would preclude any further enforcement actions by KBC." Pertamina seeks to have the Cayman Islands court "restrain KBC from taking any such steps."

The Amended Writ of Summons, dated October 6, 2006, is the same, in all material respects, as the original Writ of Summons, and contains the same language quoted from the original Writ of Summons earlier in this opinion.

The Statement of Claim, dated October 6, 2006, contains a section entitled "Particulars of Loss and Damage" in paragraph 54. These are consistent with what is in the Skeleton Argument.

### The Current Motion

On September 21, 2006 KBC filed its motion in the Southern District requesting an order prohibiting Pertamina from engaging in legal proceedings in the Cayman Islands. In its brief Pertamina expanded the motion to embrace any similar actions in other jurisdictions. Oral argument was held on September 26.

During the argument, counsel for Pertamina represented that by bringing suit in the Cayman Islands, Pertamina was not seeking to interfere with the mechanisms of this Court and stated that Pertamina would not oppose the turnover of funds to KBC in the event that the Supreme Court denied certiorari. However, counsel did not agree that Pertamina would withdraw the claim that the fraud vitiated the Arbitral Award. Moreover, counsel took the position that Pertamina (while agreeing, through New York counsel, to have the funds turned over to KBC) was free to petition the Cayman Islands court to enjoin KBC from distributing or disposing of the funds that it received from the litigation in the federal court in New York.

In view of the uncertainty as to how quickly the Cayman Islands court might move, at least with respect to provisional relief, the federal court at the September 26 oral argument issued an immediate order, which was in effect a temporary restraining order. This was embodied in a formal order of September 27, as follows:

1. Pertamina agrees to, and this court orders, that Pertamina is prohibited from making, or proceeding with any request to the courts in the Cayman Islands (or any other forum) [for] an order or injunction that would interfere with the procedures of this court in enforcing the arbitration award, including turnover of restrained funds in the even that *certiorari* is denied by the Supreme Court.

2. Pertamina is prohibited from making, or proceeding with any request to the courts in the Cayman Islands (or any other forum) seeking any order or injunction against KBC interfering with KBC's use or disposition of funds that

may be turned over to it as a result of the proceedings in this court.

The Court did not make a final decision on KBC's motion, but reserved decision. The present opinion constitutes the Court's decision on that motion.

As noted above, on October 2, 2006 the Supreme Court denied certiorari. Prior to this time a total of $55,243,209.70 had been paid to KBC out of the funds restrained in New York. As noted earlier, KBC recovered $898,682.90 in Hong Kong. After the Supreme Court action, KBC requested that the additional sum of $260 million be turned over to KBC from the funds restrained in New York. A small additional amount was thought to be due when the final calculations were made, but KBC wished to have immediate payment of $260 million. Accordingly, on October 6 the Court signed an Interim Turnover Order directing that $260 million be turned over to KBC immediately. However, this was subject to the direction the Court had issued in a memorandum of September 27 to the effect that KBC could not distribute these funds without further permission of the Court. The purpose of this was to allow the Court to make a final ruling on KBC's motion, and specifically to deal with Pertamina's claim that it could use the Cayman Islands action to prevent KBC from disposing of the funds. KBC had represented to the Court that it would, if allowed to proceed normally, distribute the funds as dividends to the owners of KBC.

On November 15, 2006 a Stipulation and Order was entered, providing for the payment of a final $3,469,268.43 to KBC. This finally satisfies the judgment. A grand total of $319,611,161.03 has been paid. The September 27 memorandum applies to both the $260 million and the $3,469,268.43, but not the $55,243,209.70, which is no longer in KBC's hands.

*Discussion*

### The Nature of the Cayman Islands Action

In arguing the motion now before the Southern District, Pertamina lays considerable emphasis on the idea that Pertamina is not suing in the Cayman Islands to set aside the Arbitral Award, but is making a "new fraud claim" for damages. At the argument of the motion on September 26, 2006, the Court asked if the action in the Cayman Islands was the first time that Pertamina engaged in affirmative litigation to set said the Arbitral Award for fraud, as distinct from using fraud allegations to defend enforcement proceedings by KBC. (Minutes pp. 36–37). Counsel for Pertamina responded as follows:

> But I would disagree, your Honor, the action in Cayman is not to set aside the arbitration award. It's a totally new fraud claim, as I understand it.
>
> \* \* \* \* \* \*
>
> No, it is to—it is a damage claim, your Honor, it is to get damages for an alleged fraud.

(Minutes p. 38).

It is not entirely clear why Pertamina seeks to make this distinction. The Cayman Islands action is what it is, and labels do not change it. In any event, the theory that the Cayman Islands action is nothing but a "new fraud claim," merely seeking damages is wholly without substance.

To be sure, Pertamina alleges fraud in the Cayman Islands court. However, the entire point of the fraud allegations is to show that the Arbitral Award must be deemed to be vitiated—*i.e.,* to be a nullity. The "damages" sought are almost entirely the amount of the Arbitral Award plus the interest which has accrued during enforcement proceedings.

Although counsel for Pertamina stated at the September 26 hearing that Pertamina has no intention to use the Cayman Islands action for the purpose of enjoining proceedings in the United States courts, that is exactly what is sought both in the original Writ of Summons and the Amended Writ of Summons.

It is true that there was very little left to enjoin, in connection with the proceedings in the United States courts, when the Cayman Islands action was commenced. But this does not take away from the fact that Pertamina filed suit in the Cayman Islands with the clear objective of stopping *whatever could be stopped* by way of legal proceedings to enforce the Arbitral Award. Pertamina is still seeking to achieve that objective.

At the time the Cayman Islands action was brought, Pertamina's petition for certiorari was still pending before the United States Supreme Court. Of course, there was no attempt to have the Cayman Islands court interfere with what was going on in the Supreme Court. After the Supreme Court denied certiorari, all that was left was to have judgment entered directing that restrained funds be turned over to KBC to satisfy the Texas federal court judgment. In the August 28, 2006 letter, counsel for Pertamina had stated that "Pertamina will agree to the payment of KBC's judgment," in the event that the Supreme Court denied certiorari.

What was in fact left for Pertamina to restrain by way of the Cayman Islands action? In fact, Pertamina found something of great importance. In the Amended Summons of September 21, 2006 Pertamina requested the Cayman Islands court to issue an order to the effect that KBC would be restrained from *disposing of any funds* collected through the enforcement of the Arbitral Award.

But the basic nature of the Cayman Islands action was confirmed in the Amended Writ of Summons filed by Pertamina on October 6, 2006. This was after the Supreme Court had denied certiorari. It was after counsel for Pertamina had stated at the September 26 hearing that in the Cayman Islands action Pertamina was not seeking to interfere with the mechanisms of this Court. It was after an affidavit of a Pertamina officer filed with the Cayman Islands court, purporting to make the same point. Nevertheless the October 6 Amended Writ of Summons repeated the allegations and claims of the original Writ of Summons of September 15, contending that the Arbitral Award should be considered "vitiated" and that KBC should be restrained from prosecuting any proceedings to enforce the Arbitral Award. This showed that the purpose of the Cayman Islands action was and still is to halt, in whatever way is available, the judicial proceedings in the United States and the consummation of those proceedings.

It should be noted that, out of the $319 million collected by KBC, as described earlier, approximately $55 million has already been distributed to the owners of KBC. The sum of approximately $263 million, recently turned over to KBC is still in KBC's hands. It is this amount which would be reached if the Cayman Islands court entered an order restraining KBC from disposing of funds.

It is apparent beyond question that the effort to prevent KBC from *using* the money, as a full owner of such money, is part and parcel of the attempt to nullify the Arbitral Award. If the action in the Cayman Islands were about some completely unrelated matter, and the effort to restrain KBC from disposing of the funds were for the purpose of securing a judgment in such unrelated matter, that would be a completely different situation. But the Cayman Islands actions is all about defeating KBC's Arbitral Award, and is

about preventing KBC from realizing the funds of that award.

Beyond this, the Cayman Islands action has the obvious purpose of nullifying the judgment of the federal court in Texas confirming that award and the judgments of the Southern District of New York, allowing KBC to recover from funds restrained in New York. The objective of the Cayman Islands action is to prevent the completion and consummation of the carrying out of those judgments.

**Remedies to Vacate Judgment**

As was just explained, Pertamina is in effect seeking to overturn not only the Arbitral Award, but the judgments of the federal courts in Texas and New York. To do so, Pertamina has commenced the action in the Cayman Islands. KBC, at least at the present, is not relying upon the presentation of defenses to the Cayman Islands court. KBC is moving in the Southern District of New York to prevent Pertamina from going forward with its Cayman Islands suit. This necessarily requires consideration of the judicial authorities relating to anti-suit injunctions. These authorities will be discussed in the next section of this opinion. However, the Court has thought it instructive to discuss United States law regarding the ability of a judgment creditor to set aside the judgment against him on grounds of fraud.

■ Fed.R.Civ.P. 60(b)(3) allows a motion to be brought to relieve a party from a final judgment for "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." A party bringing a Rule 60(b)(3) motion must establish by clear and convincing evidence "(1) that the adverse party engaged in fraud or other misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting his case." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir.2005). Additionally, Rule 60(b) re-

quires that the motion be brought in the court that rendered the judgment, within one year of the judgment.

Rule 60(b) goes on to provide:

This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court.

It should be noted that the reference to 28 U.S.C. § 1655 has no relation to the present case. It concerns the enforcement of liens against absent defendants.

■ The provision for "an independent action" is designed to preserve the traditional remedy in equity to overturn judgments. 12 *Moore's Federal Practice* § 60.80. The most common ground asserted in independent actions is fraud. *Id.* § 60.81. Although it is not entirely clear from the text, the drafters of the rule apparently intended to distinguish between an "ordinary" independent action for fraud, and an action charging "fraud on the court," although the two are (understandably) sometimes confused. *Id.* § 60.81[1][b][v]. "Fraud upon the court" refers to matters such as the bribery of a judge, jury tampering, or fabrication of evidence by an attorney. Illustrative cases are *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *Root Refining Co. v. Universal Oil Prods. Co.*, 169 F.2d 514 (3d Cir.1948); and *Platt v. Threadgill*, 80 F. 192 (C.C.W.D.Va.1897). It appears that the general provision about "an independent action" may allow claims of fraud on a broader basis. However, for reasons that will appear, it is not necessary in the present case to be concerned about the possible distinctions in the rule or about the exact boundaries of an inde-

pendent action seeking to set aside a judgment for fraud.

■ The important thing, for present purposes, is to recognize that the use of an independent action to set aside a judgment for fraud has definite limitations under the decided cases. The Supreme Court has stated in *United States v. Beggerly:*

> Independent actions must, if Rule 60(b) is to be interpreted as a coherent whole, be reserved for those cases of "injustices which, in certain instances, are deemed sufficiently gross to demand a departure" from rigid adherence to the doctrine of res judicata. *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 244, 64 S.Ct. 997, 88 L.Ed. 1250 (1944).

524 U.S. 38, 46, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998). The Supreme Court went on to state that "an independent action should be available only to prevent a grave miscarriage of justice." 524 U.S. at 47, 118 S.Ct. 1862. The Court reversed the vacating of a judgment, finding in that case that the failure to thoroughly search for certain records and to make full disclosure to the court rendering the judgment did not amount to grave miscarriage of justice. *Id.* The Court did, however, cite *Marshall v. Holmes,* 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870 (1891), to illustrate when setting aside a judgment for fraud would be justified. There a judgment had been obtained by means of a forged letter.

■ The courts also adhere to the equitable rule that there must be a showing of no adequate remedy at law. *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 71 (2d Cir.1990). The Second Circuit stated in *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,*

> It is fundamental that equity will not grant relief if the complaining party has, or by exercising proper diligence would have had, an adequate remedy at law, or by proceedings in the original action …

to open, vacate, modify, or otherwise obtain relief against, the judgment.

117 F.3d 655, 662–663 (2d Cir.1997). Also, the party seeking relief must comply with the equitable "clean hands" standard. 12 *Moore's Federal Practice* § 60.82[2].

■ Although there is no statute of limitations for an independent action, the equity doctrine of laches applies. *Simons v. United States,* 452 F.2d 1110, 1116 (2d Cir.1971); 12 *Moore's Federal Practice* § 60.83.

It is obvious that the defenses and limitations just described will generally be applied in the courts where actions are brought to set aside the judgments.

In the present case, of course, KBC is not arguing these points in the Cayman Islands, but is moving to have the Southern District of New York prohibit Pertamina from proceeding further in the Cayman Islands. It is the view of this Court that the law about the use of independent actions to overturn judgments must be considered on the issue of whether KBC's motion should be granted.

### Anti–Suit Injunctions

■ There are well-defined limits on anti-suit injunctions against suits in foreign countries. These limits are based largely on considerations of international comity. But where a judgment has been entered in an American court, that court has authority to enjoin a party before it from suing in a foreign country where such suit is an abusive attempt to undermine that judgment.

■ Judge Mukasey of this Court has observed that, "after judgment in the domestic litigation, some showing of harassment, bad faith or other equitable circumstance is sufficient to support enjoining the foreign litigation." *Farrell Lines Inc. v. Columbus Cello–Poly Corp.,* 32 F.Supp.2d 118, 131 (S.D.N.Y.1997), *aff'd sub nom,*

*Farrell Lines Inc. v. Ceres Terminals Inc.,* 161 F.3d 115 (1998). Similarly, the D.C. Circuit has stated that when "the injunction is requested after a previous judgment on the merits ... a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation." *Laker Airways Ltd. v. Sabena Belgian World Airlines,* 731 F.2d 909, 928 (D.C.Cir.1984).

On the other hand, Pertamina relies on a group of cases where courts have ruled that anti-suit injunctions should not be granted. *See e.g., China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir.1987); *LAIF X SPRL v. Axtel, S.A. de C.V.,* 390 F.3d 194, 199 (2d Cir. 2004). In those cases there were parallel proceedings occurring simultaneously in the United States and in a foreign forum. The principal case is *China Trade.* There, the Court was faced with a litigant who brought suit in Korea while the same issue was being litigated in the Southern District of New York. Emphasizing that parallel proceedings in two forums are "ordinarily tolerable" and should be allowed to proceed simultaneously, 837 F.2d at 36, the Court reversed the District Court's granting of the injunction. However, the holdings in *China Trade* and the other parallel proceedings cases, and what is referred to as "the *China Trade* test," are not applicable in the present case.

The case at hand is not a parallel proceedings case. Here judgments were entered in the American courts (Texas 2001 and New York 2004) well before the Cayman Islands action was commenced (September 2006). This is a case where the issue is whether there is a misuse of the foreign court to evade the American judgments. It is of interest that both Judge Mukasey and the D.C. Circuit gave consideration to international comity in accordance with the *China Trade* line of cases, but they acknowledged that a "more le-

nient standard" would apply once a judgment has been entered, and proceeded to speak decisively of the need to protect against abusive foreign litigation mounted following entry of the American judgments. *Farrell,* 32 F.Supp.2d at 131; *see also Laker Airways,* 731 F.2d at 928; *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,* No. 96–Cv–3231, 2002 WL 975623, at *6–7, 2002 U.S. Dist. LEXIS 8307, at *20–21 (S.D.N.Y. May 8, 2002), *aff'd,* 53 Fed.Appx. 597 (2d Cir.2002).

■ Aside from the need to protect against abusive foreign litigation, other considerations are relevant to the appropriateness of granting an anti-suit injunction. One concern is the need for the Court to protect its jurisdiction. Both *Laker Airways* and *China Trade* recognized the propriety of enjoining a suit in a foreign court where such an injunction is necessary to protect the American court's jurisdiction. *Laker Airways,* 731 F.2d at 927–31; *China Trade,* 837 F.2d at 36–37 (*citing Laker Airways,* 731 F.2d 909).

Another relevant consideration to this Court's ability to act in the face of comity considerations is the extent to which a litigant attempts to avoid the forum's important public policies. The D.C. Circuit commented that "deference to the foreign proceeding may be denied because of the litigant's unconscionable evasion of the domestic laws." *Laker Airways,* 731 F.2d at 931 n. 71. Indeed, the Second Circuit has held that "orders of foreign courts are not entitled to comity if the litigants who procured them have deliberately courted legal impediments to the enforcement of a federal court's orders." *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 60 (2d Cir. 2004). In the present case, Pertamina is seeking to avoid the application of well-settled American law and policies about the limited methods which can be used to

interfere with the normal finality of judgments.

It should be noted that KBC has once before sought an anti-suit injunction in this case. In March 2002, several months after the federal district court in Texas issued its final judgment in favor of KBC, Pertamina filed suit in Indonesia seeking to annul the Arbitral Award, and sought an injunction to prevent KBC from seeking to enforce the award. Before the application on the injunction was scheduled to be heard in Indonesia, KBC applied to the court in Texas for a temporary restraining order to prevent Pertamina from seeking its injunction in Indonesia. The district court granted KBC's application. Pertamina did not withdraw its request and the Indonesian court issued a provisional injunction. KBC then moved for a preliminary injunction against Pertamina's further pursuing the Indonesian action. The district court granted the injunction. The Fifth Circuit reversed. *Karaha Bodas Co., L.L.C., v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 335 F.3d 357 (5th Cir.2003).

The Fifth Circuit's opinion rested chiefly on the idea that the New York Convention, the operative treaty under which KBC sought to enforce its award, allows simultaneous enforcement and annulment proceedings in other countries. As a result, the United States courts "have discretion under the Convention to enforce an award despite annulment in another country." *Id.* at 369. Thus, the "Indonesian court's annulment fails to jeopardize the enforcement of the award elsewhere." *Id.* The court reasoned that since there was no real threat to enforcement in the United States, comity counseled against issuing the injunction.

Clearly, the anti-suit injunction sought now by KBC presents itself in a much different procedural and temporal context. The policies underlying the New York Convention no longer apply. Pertamina is not seeking to annul the award under the New York Convention's procedures and has no need of protection of any right under such Convention. Pertamina is indeed seeking to "jeopardize the enforcement of the award" in the United States by means of the injunction it is seeking in the Cayman Islands. Finally, the litigation has proceeded to an entirely different juncture than where it stood in 2003. The significance of this will be dealt with later in this opinion. In short, the Fifth Circuit's decision is not instructive on what should be done now.

**An Injunction Should Be Issued**

■ As already described, the motion before this Court is to enjoin Pertamina from pursuing the litigation in the Cayman Islands and similar litigation elsewhere. It is not for this Court to deal with the merits of Pertamina's suit in the Cayman Islands, or to determine whether Pertamina's allegations of fraud do or do not have merit. However, this Court does have the responsibility of making certain findings with respect to the nature of the Cayman Islands action in relation to *federal court judgments* in the United States.

■ The previous section of this opinion, dealing with Fed.R.Civ.P. 60(b), illustrates the fact that under American law, a final judgment in a litigation is given a very high degree of protection, and can be overturned in a new and independent lawsuit only under exceptional circumstances, even when fraud is alleged. One of these circumstances is where "fraud upon the court" is proven. However, no such thing is alleged in the Cayman Islands. No claim is made there of forged evidence or bribery or anything else of that nature. What is claimed in the Cayman Islands is that, during the dealings between KBC and Pertamina, KBC made misrepresentations regarding the quantity of geothermal

reserves or resources. As already described, the issue of the accuracy of KBC's representations on this subject was before the arbitrators. What has now occurred is that Pertamina claims it has new evidence showing that KBC defrauded Pertamina on the subject of the quantity of geothermal reserves or resources, something which Pertamina apparently did not literally allege in the arbitration. There is surely a serious question about whether the situation involves the kind of gross injustice or grave miscarriage of justice, demanding a departure from adherence to the doctrine of *res judicata*, within the meaning of the Supreme Court's holding in *United States v. Beggerly*, 524 U.S. 38, 46–47, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998).

But beyond this, it is necessary to reckon with the tactics employed by Pertamina. The alleged new evidence of fraud comes from documents voluntarily turned over by KBC to Pertamina in Indonesia. KBC asserts that the documents became available to Pertamina in March 2001. Pertamina states that it was not until November 2002 when this happened.

It will be recalled that summary judgment confirming the Arbitral Award was issued by the federal court in Texas on December 4, 2001. If Pertamina had the documents in March 2001, as KBC claims, it had ample time to file a motion under Rule 60(b)(3) in the Texas district court within the one year time limit. And even if Pertamina did not have the documents until November 2002, the one year time limit had still not expired at that time. Furthermore, even after the expiration of that one year, a prompt filing of an "independent action" could have brought Pertamina's fraud allegations before the Texas district court.

Of course, Pertamina asserts that it did not look at the documents until August 2005, and therefore did not appreciate their significance until that time. Even if this is true, there is surely a serious problem about Pertamina's diligence. During the arbitration, Pertamina had raised suspicions about the amount of reserves which KBC had represented, and this was enough of an issue to cause the arbitrators to cut substantially the amount of the award for lost profits from what KBC had requested. The award was still very large ($150 million) and Pertamina has fought strenuously to prevent KBC from recovering even the reduced award. In view of this campaign against KBC, it is difficult to justify Pertamina's delay of three years or more in looking at documents left in its possession by KBC.

But even if it is assumed that Pertamina was justified in waiting until August 2005 to discover the evidence now relied upon, what Pertamina did after that raises grave questions. Pertamina knew by then that recovery on the Arbitral Award would occur almost entirely by means of enforcement proceedings in the United States. Sufficient funds had been restrained in New York City, under process of the Southern District of New York, to provide over $300 million to pay the amount of the Arbitral Award plus interest. Although it was too late by August 2005 to file a motion under Rule 60(b)(3) to set aside the judgment of the district court in Texas, it was open to Pertamina to attempt an "independent action" under Rule 60(b). This would have been a direct and straightforward method to determine whether there was a right to overturn, on grounds of fraud, the Arbitral Award and the judgment based thereon.

However, Pertamina did no such thing. What it did was to raise its alleged fraud claim in Hong Kong and Singapore by way of defense against enforcement actions brought by KBC in those locations. But Hong Kong and Singapore had virtually no significance in the KBC–Pertamina con-

test. As it turned out only 3/10 of 1% of the judgment debt was collected in Hong Kong, and nothing in Singapore. Almost the entire judgment debt (99 7/10%) was paid from funds restrained in the federal court in New York, in proceedings based on the judgment of the federal court in Texas. Yet Pertamina made no move to submit the fraud claim to any court in the United States.

As is now known, Pertamina developed a different strategy to prevent collection of the 99 7/10% in the United States. After 2 1/2 years of hard-fought litigation in the Southern District, a judgment was entered in that court on October 22, 2004, which would allow collection of the amount due of over $300 million. The Second Circuit affirmed the judgment on March 9, 2006. Pertamina then applied to the Supreme Court for certiorari. A decision on this certiorari petition was expected in early October 2006. The likelihood of the Supreme Court granting the petition was admittedly small.

At this point it appeared that the litigation between KBC and Pertamina was at long last about to be concluded. There was no indication of any remaining issues to be resolved, except in the unlikely event that the Supreme Court would review proceedings which had taken place in the Southern District of New York and the Second Circuit. However, in an attempt to head off possible further problems, the Court, in August 2006, asked counsel for Pertamina whether there would be any further issue which might come up following the likely denial of certiorari by the Supreme Court. On August 28, 2006 the attorney for Pertamina wrote the Court basically assuring the Court that a denial of certiorari by the Supreme Court would be the end, and specifically stating that Pertamina did not object to payment of the judgment.

Counsel for Pertamina has stated to this Court that he did not know, when he wrote that letter, that Pertamina planned to file the action in the Cayman Islands. But, of course, Pertamina knew. It deliberately concealed its plan from this Court and deliberately failed to have its attorney disclose that plan in the August 28 letter. No other conclusion is possible.

A little over two weeks later, on September 15, 2006, Pertamina commenced the action in the Cayman Islands. Shortly thereafter, as expected, the Supreme Court denied Pertamina's certiorari petition.

It is significant that, on December 31, 2003, Alfred Rohimone, Pertamina's Finance Director, told the prominent Indonesian newspaper *Komas* that the arbitration decision could no longer be disputed, but that "what Pertamina is doing now is actually only buying time." Pertamina's tactics in the Cayman Islands action are completely consistent with "buying time." Even under Pertamina's own version, it knew of the so-called new evidence of fraud by late 2005. But it made no use of that evidence in a timely action in the United States where such an action would naturally have been brought if Pertamina had sought to litigate in a fair and direct fashion. Indeed, no timely action was brought even in the Cayman Islands. Instead, Pertamina held back, waiting until the very last moment before the litigation was to be terminated. It concealed its strategy from this Court in response to a direct inquiry, and then filed an action in a foreign court.

By suing in the Cayman Islands, Pertamina is not merely seeking a judgment in a foreign court with consequences in the foreign venue. The main objective of Pertamina is to have the Cayman Islands court reach out to the United States and frustrate the consummation of the long

and difficult litigation in the United States. It is true that KBC is a Cayman Islands limited liability company. But the court actions which have resulted in the recovery of $319 million by KBC, have occurred in the United States. Pertamina is seeking to have the Cayman Islands court enter orders preventing the completion and consummation of this United States litigation.

Pertamina takes the position that it is not seeking, through the Cayman Islands action, to interfere in any way with the jurisdiction or the processes of the American courts. According to Pertamina, since those processes have now been completed with final judgments and full payment to KBC of the judgment debt, no interference with or harm to the American proceedings can occur by merely having the Cayman Islands court prohibit KBC from disposing of the $263 million still in KBC's hands. This is the argument made by counsel for Pertamina at the September 26, 2006 hearing (Minutes pp. 20 *et seq.*). Counsel went on to urge that what is being pursued in the Cayman Islands is a "new claim based on new matter," and that Pertamina is merely asking the court to do something which is "an every day event" in courts—that is, to secure possible future judgments by an injunction or an attachment or a garnishment (Minutes pp. 24–25).

The problems with these theories are numerous. In the first place, the Cayman Islands action is not a *new* action in the sense of raising new issues unrelated to the United States proceedings. As pointed out earlier in this opinion, the entire premise of the Cayman Islands action is that the Arbitral Award should be nullified, and that all proceedings to enforce that award should be stopped. Of course, by the time the Cayman Islands action was brought, the proceedings in the United States to enforce the Arbitral Award had been virtually completed. But Pertamina's pleadings in that action requested that all enforcement proceedings be halted by the Cayman Islands court. What that means, from a practical standpoint, is that the Cayman Islands court should take steps to stop *whatever it is possible to stop* in the way of enforcement proceedings. Moreover, there can be no doubt that the overall purpose of the Cayman Islands action is to cancel out what KBC has achieved in the United States courts by way of enforcement of the Arbitral Award. This is surely made clear by the fact that the "damages" sought in the Cayman Islands would, under the clear definition in the pleadings there, amount to the very same $319 million, which has been awarded to KBC in the United States.

It is now necessary to deal with the argument of Pertamina that this Court should not be concerned about any effect on the American judicial process because the judgments have been entered, KBC has been paid, and that is the end of the matter as far as the jurisdiction and interest of the federal courts in the United States are concerned. This Court disagrees. To explain this disagreement, certain obvious propositions must be stated. A federal court in Texas has determined that KBC is entitled to be paid the amount of the Arbitral Award plus interest. This means that, as far as the litigation between KBC and Pertamina regarding the Arbitral Award is concerned, KBC is entitled to receive the money, to own the money, and to dispose of that money as it sees fit. The litigation in the Southern District of New York determined that certain funds of Pertamina, located in New York banks, can be used to pay the judgment debt to KBC. Again, the premise of the proceedings in New York has been that, as far as the issues between KBC and Pertamina about the Arbitral Award are concerned, KBC is entitled to have the funds turned over to it, is entitled to own those funds, and is entitled to dispose of those funds as

it sees fit. The judgments referred to above are not conditional, or qualified, or limited in any way as to KBC's rights with respect to the monies awarded.

On the other hand, it is obvious that when a judgment creditor receives money awarded by a judgment, there may be many reasons why that money might be attached or might be subject to some lien or some question of title. A judgment creditor might be subject to other lawsuits or other claims of various kinds, independent of the lawsuit in which the judgment was entered.

But, if the judgment debtor is seeking to tie up the proceeds of the judgment in an action to vacate or overturn the judgment, as this Court has found that Pertamina is attempting to do, then there are definite rules about when, and under what conditions, this can be done. And courts are surely not hospitable to subterfuge designed to avoid applicable rules. For instance, if a judgment debtor files something called an action for damages against the judgment creditor, and seeks damages in the precise amount of the judgment, our courts would undoubtedly not allow this strategy as a means for evading the rules relating to proper grounds for setting aside judgments. The Cayman Islands action brought by Pertamina is exactly the kind of action just spoken of.

This Court does not accept the proposition that, under these circumstances, it has no legitimate interest in the matter and no power to protect KBC from abusive litigation, even in a foreign court. This Court believes that Pertamina's attempt to use the injunctive powers of the Cayman Islands court would, if successful, truly interfere with the jurisdiction of the federal courts in the United States. Such jurisdiction surely embraces the sanctity and finality of judgments and the rights obtained under those judgments. For reasons already indicated, it is no answer to

this to say that the only thing sought is a remedy against KBC's disposition of the funds, rather than a remedy against some ongoing court process. If KBC cannot have full ownership rights to the money, including the right to pay it to the owners of KBC, then all of the process leading up to the award of the money to KBC has been in vain.

This Court has the power, and indeed the duty, to deal with abusive litigation tactics used by a party before it. In the present case the salient fact is that, after almost six years of litigation in district and appellate courts based on the Arbitral Award, the American courts had finally resolved all the issues presented to them about whether the Arbitral Award should be confirmed and about the method by which KBC should recover the large amount due. Although procedures were available under federal law for Pertamina to make its claim of fraud and to seek to prevent KBC from recovering the $319 million, there was no attempt whatever by Pertamina to make use of such procedures. Instead, Pertamina engaged in the six years of litigation in the United States without any mention of its claim of fraud. Finally, at the very moment when the litigation was to be legitimately ended, Pertamina brought the action in the Cayman Islands after engaging in literal subterfuge in dealing with the Court in New York. The purpose of this lawsuit is to effectively wipe out the effect of the United States judgments and to do this with as great an amount of delay as possible.

### Conclusion

Under all the circumstances, the Court grants KBC's motion in the following manner. At the very least, KBC is entitled to an injunction prohibiting Pertamina from applying to the Cayman Islands court or any other court for any order restricting KBC in the use or disposition of funds

awarded to it pursuant to the judgments. Beyond this, the Court believes that the record justifies an injunction *entirely* prohibiting Pertamina from pursuing the Cayman Islands action or any similar action in any court, because KBC is entitled to be protected against litigation designed to delay the completion of this lengthy court contest.

In its notice of motion, KBC requests that the Court grant "such other and further relief as the Court deems just and proper." The Court deems it just and proper to accompany the injunction with a declaratory judgment. The nature of the declaratory judgment follows inevitably from what has been decided in this opinion. Therefore the Court will issue a declaratory judgment declaring that the funds recovered by KBC pursuant to the judgments in this matter are the property of KBC, that KBC has full right to dispose of such funds as KBC sees fit, and that, in the event that Pertamina should for some reason obtain an order of the Cayman Islands court or any other court, based upon matters relating to the Arbitral Award, purporting to interfere with KBC's rights to dispose of the funds, KBC has no obligation to comply with such order.

The parties will settle an Order and Judgment based on this opinion. When that Order and Judgment is signed by the Court, the Order of September 27, 2006, will be deemed vacated, as will the Memorandum of September 27, 2006 restricting KBC's ability to distribute funds. However, in connection with the settlement of the Order and Judgment based on this opinion, the Court will entertain an application for a stay pending appeal if any party wishes to make such an application.

SO ORDERED