[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-14092

_____

D.C. Docket No. 04-22661-CV-JLK

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 1, 2007
THOMAS K. KAHN
CLERK

RINTIN CORP., S.A.,
a Panamanian corporation,

Plaintiff-
Counter-Defendant-
Appellant,

versus

DOMAR, LTD.,
a Bermuda corporation,

Defendant-
Counter-Claimant-
Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 1, 2007)**

Before DUBINA, KRAVITCH and GIBSON,[*] Circuit Judges.

_____

*Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

GIBSON, Circuit Judge:

Rintin Corp., a Panamanian corporation, appeals from the district court's order confirming an arbitral award in a dispute between Rintin and Domar, a Bermudian corporation. Rintin was the minority shareholder and Domar the majority shareholder in a holding company, Dominicana Cement Holdings, S.A., which in turn owns 70% of Cementos Colon, S.A., which owns and operates a cement plant in the Dominican Republic. Rintin and Domar entered into a Shareholders' Agreement, under which the dispute arose and which provided for arbitration of such disputes. The Arbitrators ordered Domar to buy out Rintin's stock at a premium price of $5,184,000 and also ordered Rintin to terminate a number of lawsuits Rintin had filed around the world against Domar's affiliates and the affiliates' officers, because the Arbitrators found Rintin's filing of the lawsuits breached its contractual obligations to Domar. Rintin filed suit to vacate the arbitral order, and Domar cross-moved to confirm the award. The district court denied the motion to vacate and granted the motion to enforce. Rintin argues that the Shareholders' Agreement is void and that the Arbitrators adjudicated a controversy not submitted to them by ordering Rintin to discontinue foreign litigation against corporate affiliates of Domar and their officers. We affirm.

On October 23, 1996, Rintin and Domar entered the "Dominicana Cement Holding, S.A. Shareholders' Agreement" in order to set forth the rules by which each would participate in Dominicana. Domar was said to own 75% of the stock in Dominicana, and Rintin 25%. The Agreement contained a section governing resolution of disputes, which included an arbitration clause stating: "Any dispute which may arise from the interpretation, execution or termination of this agreement or from the breach thereof . . . shall be submitted to arbitration . . . according to the provisions of the Florida International Arbitration Act and in compliance with the rules of the American Arbitration Association (AAA)." The Agreement specified that Florida law would govern the Agreement. Later amendments on April 11 and 12, 1997, modified the agreement so that Domar owned 85% of the stock, Rintin owned 13%, and a third party, Eurocaribic Services, Inc., owned 2%. The business purpose of Dominicana was to hold 70% of the stock of Cementos Colon, S.A., which had acquired ownership of a cement plant in the Dominican Republic when the plant was privatized in 1996. The other shareholder in Cementos Colon was Corporacion Dominicana de Empresas Estatales (known as "Corde"), a company owned by the government of the Dominican Republic. Corde later sold its interest in Cementos Colon.

After the privatization, Rintin alleges that it discovered that Domar, its affiliates, and related parties had engaged in wrongful conduct that diminished the

3

value of Rintin's shares in Dominicana.  Rintin filed lawsuits in the Dominican Republic against Corde and affiliates of Domar, seeking to set aside the sale of the cement plant to Cementos Colon, which would destroy the asset Dominicana was formed to own; lawsuits in Panama against Dominicana, seeking to nullify corporate actions of Dominicana; and criminal proceedings in Switzerland and Spain against officers of Cementos Colon and of Domar's grandparent corporation, Holderbank,  for fraud.

Domar responded to this onslaught by filing a demand for arbitration before the American Arbitration Association, seeking, among other things, (1) a declaration that Rintin had breached the Shareholders' Agreement by filing the foreign lawsuits; (2) an injunction against the lawsuits pending around the world; and (3) a forced valuation and buy-out of Rintin's shares of Dominicana.  Rintin refused to submit to arbitration and instead filed suit in Florida state court seeking a declaration that the matters Domar raised before the AAA were not arbitrable.  The Florida courts ruled against Rintin, holding that the Shareholders' Agreement specified that disputes would be handled pursuant to the Florida International Arbitration Act, under which the arbitrability of a dispute is to be decided by the arbitrators.  Rintin Corp., S.A. v. Domar, Ltd., 766 So. 2d 407, 408-09 (Fla. Dist. Ct. App. 2000) (quoting Fla. Stat. ch. 684.22(1)).  The Florida courts stayed judicial proceedings pending arbitration.  Id.  at 409.

4

The Arbitrators began by resolving the arbitrability issue. After hearings and briefing, the Arbitrators held that the allegations of Domar's Amended Claim were subject to arbitration and that the allegations of Rintin's Counterclaim were also arbitrable, with the exception of Counts I, II, and V, which charged that Domar and third parties engaged in unlawful conspiracy. The Arbitrators held that Rintin's Third Party Claims against Umar (Domar's parent corporation), Holderbank (Umar's parent corporation), Corde, Dominicana, and certain officers of Holderbank and Colon were not arbitrable, as none of those parties were bound by the arbitration clause.

There followed a lengthy arbitration that lasted about four years. The Arbitrators' Final Award held that the Shareholders' Agreement and the April 11 and 12, 1997, amendments to it were made with unanimous consent of Dominicana's shareholders and were valid and binding on Rintin. The Arbitrators found that Rintin had "breached the Shareholders' Agreement by filing multiple law-suits in various countries against Domar and third parties, which challenge the basic agreements that govern [Dominicana] and Colon and, hence, their normal operations." The Arbitrators held that the evidence established that the disagreements of Rintin and Domar threatened the future viability of Dominicana; accordingly, they ordered Domar to buy Rintin's 13% interest in Dominicana for a price of $5,184,000, which included a $3,000,000 premium designed in part to

compensate Rintin for giving up its foreign lawsuits. (Rintin's investment in Dominicana was about $1.3 million.) The Arbitrators then ordered Rintin to terminate "definitively, irrevocably and unconditionally" its lawsuits against Domar, Dominicana, Umar, Cementos Colon, Holderbank, Corde, corporate officers Ackerman and Villanueva, and any other persons closely related to them.

Rather than complying with the award, Rintin then filed this suit to vacate the arbitral award, and Domar cross-moved to confirm the award. The district court found that Domar met its burden for confirmation by tendering the agreement to arbitrate and the arbitral award. Rintin Corp., S.A. v. Domar, Ltd., 374 F. Supp. 2d 1165, 1169 (S.D. Fla. 2005). The district court held that Rintin did not meet its burden of establishing a basis for vacating the arbitral award under the Florida International Arbitration Act, Fla. Stat. ch. 684.25. Accordingly, the district court confirmed the award and ordered Rintin to submit proof within 90 days that it had terminated its lawsuits against Domar, Dominicana, Umar, Cementos Colon, Holderbank, Corde, their corporate officers Ackerman and Villanueva, and any other entities or individuals closely related to the parties in that list. Id. at 1171. Rintin has been held in contempt for failure to dismiss the lawsuits, and a warrant has been issued for the arrest of Roberto Prats, Rintin's principal. Rintin Corp., S.A. v. Domar, Ltd., 403 F. Supp. 2d 1201, 1206 (S.D.

6

Fla. 2005), appeal dismissed, No. 05-17157, 2006 WL 936706 (11th Cir. March 30, 2006).

Rintin appeals, contending that the Shareholders' Agreement is void and that the Arbitrators granted relief in favor of non-parties in ordering Rintin to terminate its foreign suits against Domar's and Cementos Colon's corporate affiliates and officers of the corporate affiliates.

On an appeal of a district court's decision to confirm or vacate an arbitration award, we review the district court's resolution of questions of law de novo and its findings of fact for clear error. Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1289 (11th Cir. 2002).

The Florida International Arbitration Act closely hems in judicial review of arbitrators' awards. Fla. Stat. ch. 684.25(1) lists the affirmative defenses available to a party seeking to avoid confirmation; of these, Rintin argues that it has established three:

> (a) There was no written undertaking to arbitrate . . . .
> (d) The award . . . is contrary to the public policy of the United States or [Florida] . . . [and]
> (f) The award resolves a dispute which the parties did not agree to refer to the arbitral tribunal . . . .

Florida law specifies our method for deciding whether Rintin has established any of these three defenses. First, under the Florida International Arbitration Act, when the parties have raised in the arbitration the issue of whether a written

7

undertaking to arbitrate is valid and enforceable and the arbitrators have resolved

the question, "the tribunal's decision is final," see Task Force on International

Arbitration, Proposed Florida International Arbitration Act, Extended

Commentary 39 (1985),[1] and we make no independent assessment. Second, the

courts have power to assess whether the arbitral award violates public policy, but

the test is not whether the court would have granted the same award, but whether

the award offends "some basic principle of justice or morality or [threatens] to

frustrate some urgent public necessity." Id. at 40. Third, the arbitral tribunal's

determination that the parties agreed to refer a particular dispute to arbitration is

reviewed by the courts for clear error.[2] Fla. Stat. ch. 684.25 (1)(f).

Rintin argues that there was no written undertaking to arbitrate because the

Shareholders' Agreement was void under Panamanian law. Rintin contends that

Panamanian law required that the Shareholders' Agreement be recorded in the

public record and incorporated into the bylaws of Dominicana, which Rintin

contends never happened. The Florida International Arbitration Act provides that,

---

[1]The copy of the Task Force report in the record shows that it was obtained from the Florida State Archives; the document was apparently never published.

[2]The clear error standard of review is subject to an exception: a court may not make an independent factual determination of whether the award resolves a dispute not submitted to the arbitral tribunal if (a) the arbitration was conducted under the rules or under the supervision of an arbitral authority and (b) such ground was submitted to the authority as a basis for challenging the award. Fla. Stat. ch. 684.25(2). "In such a case, the determination of the arbitral authority concerning such grounds shall be final." Id. The parties have not argued that the conditions triggering this exception are present in this case.

except for the defenses of fraud in the inducement, contravention of public policy or previous contrary determination by arbitral panel, the question of whether a written undertaking to arbitrate is invalid or unenforceable is for the arbitrators to decide. Fla. Stat. ch. 684.22(1). Here, the issue of validity was litigated before the Arbitrators, and they found that the Shareholders' Agreement was duly adopted and was valid, contrary to Rintin's contentions, and also that the arbitration clause itself was valid and enforceable. We therefore have no authority to set aside the award on this basis. Proposed Florida International Arbitration Act, supra, at 39. Moreover, the legislative history of the Florida International Arbitration Act indicates that the phrase "written undertaking to arbitrate" was not meant to include all the elements of a binding contract. Id. at 9 (use of "written undertaking to arbitrate" was to "avoid[] any inference that a court, in order to refer a party to arbitration, must first establish that there is a valid 'agreement'–i.e., contract– to do so"). Invalidity of the Shareholders' Agreement may be a substantive defense to a claim based on the Agreement, id. at 14, but does not mean there was no "written undertaking to arbitrate," nor does it establish any of the other statutory bases under the Florida International Arbitration Act for denying confirmation of the award.

Rintin relied in its brief on Cardegna v. Buckeye Check Cashing, Inc., 894 So. 2d 860 (Fla. 2005), for the proposition that an arbitration clause in a void

9

contract could not be enforced; however, after Rintin's brief was filed, the case was reversed by the Supreme Court. In <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 126 S. Ct. 1204, 1210 (2006), the Supreme Court held that under the Federal Arbitration Act, a challenge to the validity of a contract containing an arbitration clause, rather than to the arbitration clause itself, should be determined in the first instance by the arbitrators. The distinction on which Rintin relies, between void and voidable contracts, was deemed irrelevant by the Supreme Court.[3] 126 S. Ct. at 1209.

The district court correctly concluded that Rintin had not established the absence of a written undertaking to arbitrate.

Rintin next contends that the Arbitrators resolved a dispute not properly before them by enjoining Rintin to terminate its foreign lawsuits against Domar's and Cementos Colon's affiliates and their officers.[4] Rintin contends that the Arbitrators cannot enjoin Rintin to discontinue its suits against those third parties because those disputes were never submitted to the arbitral tribunal. Domar, on

---

[3]The Supreme Court in <u>Buckeye Check Cashing</u> distinguished between challenges to the validity of a contract with an arbitration clause and arguments that a party never consented to such a contract. 126 S. Ct. at 1208 n.1. Rintin argues that the Shareholders' Agreement was void, not that Rintin never effectively consented to the Agreement. Therefore, we need not pursue the line of cases mentioned in footnote 1 to <u>Buckeye Check Cashing</u>.

[4]Domar has just filed a notice with this Court advising us that the criminal action in Spain has ended, with judgment entered in favor of the defendants. Therefore, the appeal may be moot in this respect. However, since other foreign actions are still pending and require us to resolve the issues raised by Rintin, we do not dismiss the appeal.

10

the other hand, contends that this argument mischaracterizes the relief the Arbitrators granted, which was to remedy Rintin's breach of contract and preserve the assets of Dominicana so that Domar would get something for its $5,184,000.

Whether the order to terminate the foreign suits could constitute an affirmative defense under the Florida International Arbitration Act depends on whether we view the issue as one of the scope of the arbitration, Fla. Stat. ch. 684.25(1)(f) (affirmative defense, arbitrators' decision reviewed for clear error), or of the scope of the remedy, Fla. Stat. ch. 684.24(1). Under the latter view, Rintin's argument fails; the Florida International Arbitration Act specifically commands that it is irrelevant to our confirmation of the award "whether a court of law or equity would . . . grant the relief provided for in the award." Fla. Stat. ch. 684.24(1).[5] But even if we characterize the issue as involving the scope of the arbitration, the Florida statute makes the Arbitrators' resolution of the scope issue reviewable only for clear error. Fla. Stat. ch. 684.25(1)(f). Therefore, if the Arbitrators did not clearly err in concluding that the remedy fell within the scope of the controversy referred to them, Rintin will not have established an affirmative defense to confirmation.

_____

[5]Because of this provision in the Florida Act, cases considering whether a court should enjoin litigation against a party's affiliates are not controlling. E.g., Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 652 (2d Cir. 2004) (affirming district court's injunction of Brazilian suit against affiliates of party, where suit was based on affiliate's identity with party to arbitration agreement).

The Arbitrators expressly acknowledged that Rintin's claims against Umar, Holderbank, and the other third parties were not within the scope of the arbitration clause. The final award did not grant relief to the third parties, but to Domar.[6] The Arbitrators found that by filing the lawsuits against Domar's and Cementos Colon's affiliates and their officers, Rintin breached the Shareholders' Agreement and disrupted the normal operations of Dominicana and Cementos Colon. As the district court found,

> The ultimate effect and object of [Rintin's] lawsuits was to completely dissolve and nullify the privatization of the cement plant, the ownership of which was the ultimate basis of [Dominicana], the investment vehicle in which [Rintin] was a minority shareholder and [Rintin's] only connection or interest to the cement plant.

374 F. Supp. 2d at 1167. Accordingly, the Arbitrators found it necessary, in order to enforce the Agreement, to compel termination of the suits against the affiliates and their officers. The district court also found that termination of the foreign suits was indispensable to granting relief to Domar because Rintin's suits threatened the "foundational documents of [Dominicana]" that defined Rintin's and Domar's rights with each other and with Dominicana. 374 F. Supp. 2d at

---

[6]The fact that the award runs only in favor of Domar, not the third parties, distinguishes this case from Nationwide Mutual Insurance Co. v. Home Insurance Co., 330 F.3d 843 (6th Cir. 2003). There, the arbitrators ordered payment directly to a non-party, which the Sixth Circuit found exceeded the arbitrators' authority. Id. at 847. Here, although the third parties will benefit from the award, the Arbitrators found that they could not vindicate Domar's rights under the Shareholders' Agreement without ending the foreign suits that Rintin brought in breach of the Agreement.

1171. Neither the Shareholders' Agreement nor the American Arbitration Association's International Arbitration Rules (which the Shareholders' Agreement specifies as the rules by which the arbitration shall proceed) limit the Arbitrators' power to award equitable relief. The Arbitrators did not clearly err in concluding that the order to cease litigating against the affiliates and their officers was an essential part of the remedy in the arbitrable dispute. We therefore reject the contention that the Arbitrators resolved a dispute not submitted to them.

In a similar vein, Rintin argues that the order to terminate the lawsuits pending against the affiliates in other countries violates the public policy of Florida, to wit, the policy favoring international comity. See generally Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 371-74 (5th Cir. 2003) (involving injunction by court, not arbitrator's award). The consideration of international comity must be balanced against the effect of the enjoined litigation on the proceedings in the United States. Id. at 366. Another public policy of Florida, that favoring the use of arbitration to resolve disputes arising out of international relationships, Fla. Stat. ch. 684.02(1), is far more directly implicated by the situation before us. The arbitrators found that requiring Rintin to dismiss the foreign suits was crucial to the overall relief granted. It follows that to invalidate that requirement would set the entire arbitration at naught. Moreover, the arbitration would become a sideshow if

13

Rintin were allowed to circumvent the arbitration by suing Domar surrogates in four countries. Rintin has not demonstrated that the award offends a "basic principle of justice or morality" or would "frustrate some urgent public necessity," as Rintin would have to do to establish a defense to confirmation of the award. See Proposed Florida International Arbitration Act, supra, at 39.

To the extent that Rintin's other arguments have not been subsumed in the points we have discussed, they have no merit. Rintin did not establish an affirmative defense to confirmation of the Arbitrator's award. The judgment of the district court is AFFIRMED.