[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 9, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-15325

_____

D.C. Docket No. 04-20240-CV-SH

PHIL ROSENSWEIG,

Plaintiff-Appellee,

versus

MORGAN STANLEY & CO., INC.
f.k.a. MORGAN STANLEY DEAN
WITTER, INCORPORATED,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(August 9, 2007)**

Before EDMONDSON, Chief Judge, TJOFLAT, and JOHN R. GIBSON,[*] Circuit
Judges.

_____

     [*] Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by
designation.

JOHN R. GIBSON, Circuit Judge:

Morgan Stanley appeals from an order of the district court which confirmed the award of an arbitration panel in favor of one of Morgan Stanley's former employees, Philip E. Rosensweig, and ordered the expungement of Rosensweig's regulatory record. Rosensweig had instituted the arbitration proceedings to recover damages flowing from his termination as a securities broker at Morgan Stanley and Morgan Stanley's alleged retention of client records that Rosensweig claimed belonged to him. Morgan Stanley contends that the arbitrators committed misconduct by refusing to hear evidence about certain computer disks that contained the client data and that the expungement order is contrary to public policy. We affirm the order of the district court.

Rosensweig joined Dean Witter, which later merged with and became known as Morgan Stanley, as a retail broker in Miami, Florida, in 1992. At that time, he had been a licensed securities broker for ten years, and he brought with him a significant book of business. Rosensweig kept his client information, including names, addresses, phone numbers, portfolio information, and personal notes, in a computer program called Broker's Ally, which he had purchased before joining Morgan Stanley and continued to use during his seven years there.

Rosensweig was known as a "top producer" at Morgan Stanley, with annual commissions and fees reaching as high as $900,000.

On May 28, 1999, Morgan Stanley terminated Rosensweig. When a firm terminates a registered securities broker, the firm must submit a form called a "Form U-5" setting forth the reasons for the termination to the "Central Registration Depository," where regulatory authorities can access the information. The Form U-5 Morgan Stanley submitted after Rosensweig's termination stated that he was terminated for "failure to follow instructions with respect to one account not prompted by a customer complaint, a difference in investment philosophy from the firm[,] and two customer complaints." The terms of Morgan Stanley's stock options, bonus, and deferred compensation plans allowed it to declare Rosensweig's benefits forfeited because his termination was for cause.

When a securities broker is terminated for cause in the State of Florida, the State investigates the matters set forth on that broker's Form U-5. In Rosensweig's case, the State held up the transfer of his securities license to a new firm until the investigation was complete, which took over eight months. Once his license finally cleared, Rosensweig was earning about $50,000 per year as an independent contractor with a small firm.

3

In October 2001, Rosensweig filed a complaint against Morgan Stanley with the Arbitration Division of the National Association of Securities Dealers, Inc. His statement of claim alleged that Morgan Stanley falsely reported to regulators that he was terminated for cause, which prevented him from working as a broker during the State's eight-month investigation; improperly treated his deferred compensation, stock options, and bonuses as forfeited based on the purported termination for cause; failed to return his personal property; failed to return his client information contained in the Broker's Ally computer program; and stole his clients. Rosensweig asserted claims against Morgan Stanley for breach of employment agreement, breach of equitable and just principles of trade, tortious interference, violation of the Florida Trade Secrets Act, and conversion. He sought damages for loss of future income between $1 million and $3 million and for loss of $500,000 in the deferred compensation, bonuses, and stock options that Morgan Stanley claimed were forfeited, as well as punitive damages and attorney's fees.

During discovery, Morgan Stanley repeatedly requested material regarding Rosensweig's Broker's Ally files. Rosensweig indicated that Morgan Stanley had given him back-up disks of his Broker's Ally data some time after his termination but that the disks had viruses and that he could not find them. Morgan Stanley

4

moved to strike Rosensweig's claim for damages, arguing that he should not be permitted to claim damages for lost customer relationships when he had failed to produce disks in his possession that contained all his customer data. The arbitrators denied the motion. On the Friday evening before the arbitration was scheduled to begin the following Monday, Rosensweig notified Morgan Stanley that he had found the disks and delivered them to Morgan Stanley with a warning that they might contain viruses and should be opened at Morgan Stanley's own risk.

Arbitration began on Monday, September 15, 2003, and was scheduled to last three days. Morgan Stanley indicated that it planned to present evidence and testimony about the disks but first needed a computer expert to examine them for viruses. The panel stated that the evidence would have to be presented within the three days allotted for arbitration, and Morgan Stanley acquiesced.

Rosensweig was the primary witness at the arbitration, and he offered extensive testimony about his career as a broker and his work at Morgan Stanley. Rosensweig testified that his termination came as a shock, and he cast doubt on each of Morgan Stanley's asserted reasons for the termination. He explained that the alleged "failure to follow instructions" was based on his refusal to illegally restrict the trades of a client. He testified that he had not done anything wrong to

provoke the purported "customer complaints," where one concerned his refusal to execute a client's trustee's suspect trading plans and the other was a letter from one of Rosensweig's former in-laws expressing concern about the performance of his investments. Third, he elicited testimony that the statement that he had a "difference in investment philosophy" from the firm was not meant to imply that he had done anything wrong and thus could not provide just cause for his termination. Rosensweig intimated that his branch manager did not understand the industry, particularly Rosensweig's 401(k) business, and feared that Rosensweig would defect to another firm and take other successful brokers with him. Rosensweig testified that this manager once had commented that, if Rosensweig were ever terminated from Morgan Stanley, he would never work at another major firm because the State investigation into the reasons for his discharge would hold up the transfer of his license to another firm. The investigation into Rosensweig's termination from Morgan Stanley indeed lasted over eight months. During that time, the national firm PaineWebber refused to hire him because he would be effectively unlicensed during the pendency of the investigation, and a regional firm that hired him let him go because it was taking too long for his license to transfer. Ultimately, Rosensweig took a position as an independent contractor with a small securities firm.

6

Rosensweig further testified that, in the months after his termination, he received telephone calls informing him that other brokers at Morgan Stanley were soliciting business from his clients. According to Rosensweig, Morgan Stanley refused to let him take his personal property home on the day he was terminated, giving Morgan Stanley the opportunity to print his client list from his computer and distribute copies of the list to its brokers. Although Morgan Stanley eventually gave him his computer, Rosensweig testified that the Broker's Ally program with all his client data had been deleted from it. He further testified that, upon his request, Morgan Stanley gave him a disk and a CD-Rom with a copy of the Broker's Ally program and the client data, but the disk had a virus and, while the CD-Rom contained his client contact information, his seventeen years' worth of client notes were missing. According to Rosensweig, he had an employment contract with Morgan Stanley that provided that the client list he brought with him when he joined the firm was his property.

Morgan Stanley cross-examined Rosensweig on these issues, including his use of Broker's Ally after his termination. Rosensweig admitted that he had access to many of his clients' contact information from commission statements after the termination, but explained that he was unable to conduct business for them because the State had effectively suspended his license during its

investigation of the reasons for termination that Morgan Stanley had stated on the Form U-5. Rosensweig acknowledged that his regulatory file contained several "Form U-4" customer complaints and an adverse arbitration award, but Morgan Stanley had not cited these as reasons for his termination. Moreover, there was evidence that Morgan Stanley disagreed with some of the complaints but settled them because it was most economical, and at least one was expunged by the complainant. Morgan Stanley did not produce other evidence of its reasons for terminating Rosensweig and did not call Rosensweig's former branch or regional managers to testify. Neither side was able to produce a copy of an employment agreement between Rosensweig and Morgan Stanley.

On September 17, 2003, the arbitration was adjourned until December to allow Morgan Stanley time to verify that certain personnel records had been destroyed. During the adjournment, Morgan Stanley examined the back-up disks Rosensweig had produced and filed a motion to reopen the final hearing to allow it to present evidence about the disks. Morgan Stanley had discovered that the disks had no viruses, contained substantial customer information from Broker's Ally, and had been used shortly after Rosensweig's termination, and it argued, as it had in its earlier motion to strike, that these facts discredited Rosensweig's claims by showing he had access to his client data after his termination. Morgan Stanley

8

sought to cross-examine Rosensweig about why he failed to produce the disks until the eve of arbitration and why he had claimed that Morgan Stanley had erased all his client data when the disks contained significant client information. The panel allowed Morgan Stanley to admit 21 binders containing a hard copy of the information extracted from the disks but did not permit Morgan Stanley to elicit testimony about the disks. At the close of the proceedings, Morgan Stanley stated that it did not feel that the proceedings had been fair because it was not allowed to conduct additional cross-examination on the disks.

The arbitration panel found Morgan Stanley liable to Rosensweig on the claims for breach of employment agreement, tortious interference, and conversion, and awarded him compensatory damages of $1,649,860.00. The panel also recommended that the Form U-5 be changed to state "broker was discharged without cause," and that other adverse documentation in the Central Registration Depository related to Rosensweig's discharge from Morgan Stanley be neutralized. It denied Rosensweig's other claims, including his request for punitive damages, attorney's fees, and relief under the Florida Trade Secrets Act.

The district court confirmed the award and ordered the expungement of Rosensweig's record. In its motion to vacate, Morgan Stanley had argued that the panel was biased in favor of Rosensweig, that the award was arbitrary and

capricious because it granted Rosensweig damages even though he had possession of his client information in the back-up disks, and that the arbitrators committed misconduct by refusing to allow Morgan Stanley to introduce testimony about the disks. The court rejected all these arguments, stating that a number of grounds supported the panel's decision and that the panel had the discretion to limit the evidence that would be taken on the disks.

On appeal, Morgan Stanley has narrowed its complaints to two arguments: 1) the arbitrators committed misconduct by refusing to allow it to present pertinent and material evidence about the disks, and 2) the expungement of Rosensweig's regulatory record is contrary to public policy.

I.

On appeal of a district court's confirmation of an arbitration award, we review its factual findings for clear error and its legal conclusions de novo. Rintin Corp., S.A. v. Domar, Ltd., 476 F.3d 1254, 1258 (11th Cir. 2007).

The Federal Arbitration Act presumes that arbitration awards will be confirmed, and judicial review of an arbitration award is narrowly limited. B.L. Harbert Int'l, LLC v. Hercules Steel Co., 441 F.3d 905, 909 (11th Cir. 2006); see also Davis v. Prudential Sec., Inc., 59 F.3d 1186, 1190 (11th Cir. 1995). The Act sets forth four bases for vacating an award; Morgan Stanley challenges the

arbitration panel's decision on the third statutory ground: "Where the arbitrators were guilty of misconduct in refusing . . . to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). In making evidentiary determinations, arbitrators are not required to "follow all the niceties observed by the federal courts," but they must give the parties a fundamentally fair hearing. See Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997) (internal quotation marks and citation omitted). Morgan Stanley argues that it was deprived of a fair hearing when the arbitrators refused its request to introduce testimony about the Broker's Ally disks. Rosensweig contends that the arbitrators acted within their discretion because any further evidence about the disks would have been cumulative and immaterial.

Arbitrators "enjoy wide latitude in conducting an arbitration hearing," and they "are not constrained by formal rules of procedure or evidence." Robbins v. Day, 954 F.2d 679, 685 (11th Cir. 1992), overruled on other grounds, First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 948 (1995). "An arbitrator need not consider all the evidence the parties seek to introduce but may reject evidence that is cumulative or irrelevant." Scott v. Prudential Sec., Inc., 141 F.3d 1007, 1017 (11th Cir. 1998). In addition, "[a] federal court may vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and material evidence

11

prejudices the rights of the parties to the arbitration proceedings." Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901, 763 F.2d 34, 40 (1st Cir. 1985). In this case, the panel did not explain its reasons for limiting Morgan Stanley's ability to introduce testimony and cross-examine Rosensweig about the back-up disks, so we inquire whether there was any reasonable basis for its decision. See Schmidt v. Finberg, 942 F.2d 1571, 1574 (11th Cir. 1991).

We conclude that the arbitrators committed no misconduct because they had several reasonable bases for limiting evidence about the disks, none of which prejudiced Morgan Stanley. First, the arbitrators reasonably could have concluded that additional testimony would have been cumulative. Morgan Stanley's motion to reopen sought to introduce testimony that the disks contained significant amounts of Rosensweig's client information, had no viruses (contrary to Rosensweig's representations during discovery), and were used shortly after Rosensweig's termination. The panel granted the motion insofar as Morgan Stanley sought to introduce a hard copy of the contents of the disks, so additional testimony was not necessary to establish that the disks contained most of Rosensweig's client data. Moreover, the record shows that Morgan Stanley had already discredited Rosensweig's claim that it deprived him of all his client data

12

during its cross-examination of Rosensweig at the initial hearing. Rosensweig admitted that he had access to contact information for many of his clients soon after his termination, that he eventually was able to retrieve all the data except for his client notes from the disks, and that some clients followed him to his new firm. The issue of why Rosensweig failed to produce the back-up disks until the eve of arbitration was not covered during Rosensweig's testimony, but Morgan Stanley has not explained how this discovery issue is substantively relevant to Rosensweig's claims. We do not see what a second cross-examination of Rosensweig would have added to the record.

Morgan Stanley insists that the testimony it sought to introduce would have defeated Rosensweig's claims and demonstrated that he suffered no damages by showing that Morgan Stanley provided him with all his client data shortly after his termination. We reject this argument. Even apart from the fact that the evidence was cumulative, Rosensweig's possession of working disks was not necessarily inconsistent with his right to recover for breach of employment agreement, tortious interference, and conversion.

Morgan Stanley's improper retention of Rosensweig's Broker's Ally data was one theory advanced in support of each of his claims, and thus testimony that Rosensweig had access to that data soon after his termination arguably would have

13

been relevant. Nonetheless, the panel's refusal to hear testimony about the disks did not deprive Morgan Stanley of a fair hearing in this case. See Hoteles Condado Beach, 763 F.2d at 40 (not every failure of an arbitrator to receive relevant evidence amounts to misconduct requiring vacatur of the award). The evidence Morgan Stanley sought to introduce would have shown that it provided Rosensweig with disks containing most of his Broker's Ally data soon after his termination, discrediting his allegations that it deprived him of his client records and prevented him from contacting his clients. Rosensweig's own testimony also had this effect. The evidence concerning the back-up disks does not address, however, a crucial part of Rosensweig's client data-related claims--that Morgan Stanley improperly copied his client lists and distributed them to Morgan Stanley brokers, who then solicited his clients. Thus, the panel reasonably could have concluded that, even if Morgan Stanley promptly provided Rosensweig with copies of his Broker's Ally data after his termination, Morgan Stanley nevertheless was liable for breach of employment agreement on the basis of Rosensweig's testimony that his employment agreement provided that his client information was his property, and he received many calls informing him that Morgan Stanley brokers were calling individuals on his client lists after his termination, using copies made by Morgan Stanley. Rosensweig's tortious interference and

14

conversion claims were supported by the same testimony.  The arbitrators reasonably could have concluded that tortious interference lay, not in Morgan Stanley depriving Rosensweig of his client data, but in Morgan Stanley brokers' use of Rosensweig's client lists to solicit his customers.  Similarly, they could have concluded that conversion did not lie in Morgan Stanley deleting all of Rosensweig's client data, but in its retaining copies of his client lists, as well as failing to return the client notes component of his Broker's Ally data.  Thus, to the extent that evidence that Morgan Stanley provided Rosensweig with back-up disks of his Broker's Ally data was relevant to one of Rosensweig's theories for recovery, the arbitrators committed no misconduct by disallowing it in light of Rosensweig's unrefuted testimony that Morgan Stanley retained and used copies of his client lists and failed to return his client notes.

Moreover, Rosensweig's theory of wrongful termination provides a wholly independent basis from which the panel reasonably could have concluded that Rosensweig had established his claims, even if Rosensweig had complete access to his Broker's Ally data after his termination.  On his breach of employment agreement claim, Rosensweig's evidence indicated that Morgan Stanley

terminated him without just cause in violation of the terms of his employment,[1] an issue to which the disks are immaterial. Rosensweig's tortious interference claim is supported by evidence that Morgan Stanley reported false reasons for his termination on the Form U-5, knowing this would prompt an investigation that would effectively suspend his broker's license and thus preclude him from joining a new firm and conducting securities transactions for his clients for months. Finally, the disks are also immaterial to Rosensweig's alternate theory of conversion, on which the evidence showed that Morgan Stanley improperly treated his deferred compensation, stock options, and bonuses as forfeited by claiming that his termination was for cause.

Morgan Stanley disagrees that wrongful termination is a proper theory for sustaining Rosensweig's claims. Citing a footnote in the statement of claim in which Rosensweig stated, "The relief that Rosensweig seeks in this case does not depend on whether his termination was for cause or not for cause," Morgan Stanley argued before the arbitration panel and now argues on appeal that Rosensweig never asserted a claim for wrongful termination. It contends, rather,

---

[1]Before the arbitration hearing began, Morgan Stanley filed a motion to dismiss arguing that Rosensweig was an at-will employee and thus no just cause for termination was required. The panel denied this motion, and Morgan Stanley has not appealed. Thus, we assume that Morgan Stanley could not terminate Rosensweig without just cause.

that the essence of Rosensweig's complaint was that Morgan Stanley stole his computerized client records, and that Rosensweig unfairly has attempted to recast his claims to fit the evidence as the arbitration progressed.

After a thorough review of the record, we conclude that Morgan Stanley's reading of the statement of claim and the arbitration proceedings is not an accurate one. It is true that Rosensweig did not assert a claim entitled wrongful termination, but this is consistent with Florida law which provides no action for the common law tort of wrongful termination. See Bass v. Metro Dade County Dep't of Corr. & Rehab., 798 So. 2d 835, 836 (Fla. Dist. Ct. App. 2001). The record as a whole is clear that Rosensweig advanced the legal theory of wrongful termination to support his claims, with Morgan Stanley's use and retention of his client data from Broker's Ally an alternative theory for relief. Morgan Stanley's own pleadings belie its present intimation that it did not receive fair notice that Rosensweig was advancing the theory of wrongful termination. In its answer to his statement of claim, it argued for the dismissal of "Rosensweig's claim for 'wrongful termination' or 'breach of employment agreement'" on the grounds that he was an at-will employee. Thus, we reject Morgan Stanley's characterization of the case as turning on its handling of Rosensweig's client records; to the contrary,

wrongful termination was a significant, independent issue, and one to which the back-up disks were immaterial.

In sum, the district court correctly denied Morgan Stanley's motion to vacate the arbitration award because the arbitrators reasonably could have concluded that the testimony Morgan Stanley sought to introduce was cumulative and not determinative of the claims on which Rosensweig prevailed, and thus Morgan Stanley was not deprived of a fair hearing. See Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 481 F.3d 813, 818-19 (D.C. Cir. 2007) (arbitrators' refusal to hear cumulative or immaterial testimony does not deprive parties of a fair hearing).

## II.

Morgan Stanley also argues that the district court erred by ordering the expungement of Rosensweig's regulatory record as recommended by the arbitration award, contending the expungement is against public policy. See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 665, 670 (11th Cir. 1988). According to Morgan Stanley's reading of the arbitration award, the expungement removes not only the false reasons for Rosensweig's termination but also all complaints that were filed against Rosensweig before his termination, sweeping his regulatory record clean in a way that will mislead the public.

18

The relevant portion of the award reads:

[T]he Panel recommends that all documentation in [National Association of Securities Dealers Central Registration Depository] referencing the Morgan Stanley, DW, Inc. discharge be changed such that 1) any "Yes" answers to Questions 14J1 and/or 22N1 submitted on subsequent Form U-4 filings be changed to "No", 2) any Disclosure Reporting Pages be expunged and 3) any other documentation be expunged.

The expungement order based on this recommendation affects only those items in Rosensweig's regulatory record that refer to his termination from Morgan Stanley and thus is completely consistent with public policy. Morgan Stanley contends that the language "any other documentation" in the third enumerated item encompasses all customer complaints in Rosensweig's record, including those Form U-4s filed before his termination, but Morgan Stanley reads the recommendation too broadly. The three enumerated items for expungement all are qualified by the introductory phrase "all documentation in [National Association of Securities Dealers Central Registration Depository] referencing the Morgan Stanley, DW, Inc. discharge." The order is properly written to eliminate all adverse reports based on Rosensweig's discharge from Morgan Stanley, but nothing else.

We AFFIRM the district's order confirming the arbitration award and ordering a limited expungement of Rosensweig's regulatory record.

19